**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

**FILED**

SEP - 9 2009

Clerk, U.S. District and
Bankruptcy Courts

|  |  |
|---|---|
| JAMES GORDON<br>8004 Langbrook Road<br>Springfield, Virginia 22152, | )<br>)<br>)<br>) |
| Plaintiff, | )<br>) |
| v. | )<br>) |
| ARMORGROUP NORTH AMERICA, INC.<br>1420 Spring Hill Road<br>McLean, Virginia 22102, | )<br>)<br>) |
| Serve: | )<br>) |
| CORPORATION SERVICE COMPANY<br>11 S 12th Street<br>Richmond, Virginia 23218, | )<br>)<br>) |
| and | )<br>) |
| ARMORGROUP INT'L, PLC<br>Egginton House<br>25 – 28 Buckingham Gate<br>London, United Kingdom<br>SW1E 6LD, | )<br>)<br>)<br>)<br>) |
| Serve: | )<br>) |
| CORPORATION SERVICE COMPANY<br>2711 Centerville Road<br>Suite 400<br>Wilmington, Delaware 19808 | )<br>)<br>)<br>) |
| WACKENHUT SERVICES, INC.<br>7121 Fairway Drive, Suite 301<br>Palm Beach Gardens, Florida 33418 | )<br>)<br>) |
| Serve: | )<br>) |

Case: 1:09-cv-01717
Assigned To : Lamberth, Royce C.
Assign. Date : 9/9/2009
Description: General Civil

JURY ACTION

PRENTICE-HALL CORPORATION              )
SYSTEM, INC.                           )
1090 VERMONT AVENUE, N.W.              )
Washington, DC 20005                   )
                                       )
and                                    )
                                       )
JERRY HOFFMAN                          )
8601 Trabue Road                       )
Richmond, Virginia 23235               )
                                       )
and                                    )
                                       )
CORNELIUS MEDLEY                       )
1420 Spring Hill Road                  )
McLean, Virginia 22102,                )
                                       )
        Defendants.                    )
_____)

## COMPLAINT FOR DECLARATORY, INJUNCTIVE, AND MONETARY RELIEF AND JURY DEMAND

### Preliminary Statement and Introduction

1.     This is a civil action against Defendants ArmorGroup North America ("AGNA"),

ArmorGroup International ("AGI"), Wackenhut Services Inc. ("WSI"), and named management

individuals (collectively "Defendants"), for declaratory, injunctive and monetary relief for

injuries Plaintiff James Gordon sustained as a result of his unlawful demotion, harassment, and

constructive discharge, in retaliation for his whistleblowing, internally and to the United States

Department of State ("DoS"), about illegalities committed by Defendants in the performance of

AGNA's contracts with the United States to provide security services at the U.S. Embassy in

Kabul, Afghanistan and at the U.S. Naval base in Bahrain, in violation of the anti-retaliation

provision of the False Claims Act, 31 U.S.C. § 3730(h).

2.     Plaintiff, who took over as Director of Operations of AGNA in August 2007, was

tasked with rectifying serious deficiencies DoS had identified on July 19, 2007, in AGNA's

2

performance of the U.S. Embassy contract that led DoS to conclude "that the security of the U.S. Embassy in Kabul [was] in jeopardy." Despite Plaintiff's diligent efforts, Defendants refused to allocate sufficient funds to execute the contract properly, opting instead to hire unqualified, poorly vetted personnel on the cheap, install a rogue management team, cut corners and promote a mentality of corporate profit over safety and security of the U.S. Embassy, and cover up Defendants' misconduct by making numerous false claims and statements, misrepresentations, and material omissions to DoS and Congress regarding AGNA's performance under its DoS contract.

3.      During his seven-month tenure as Director of Operations, Plaintiff investigated, attempted to stop, and reported to DoS a myriad of serious violations committed by Defendants, including:

- understaffing the guard force necessary to protect the U.S. Embassy to such an extent that Plaintiff felt compelled to warn DoS that under AGNA's staffing scheme, "if one person gets sick or slips on a banana peel the whole thing falls apart like a cheap suit;"

- hiring and retaining a Gurkha workforce to guard the U.S. Embassy, the vast majority of whom could not speak English, in violation of AGNA's contract with DoS, and misrepresenting the workforce's language qualifications to DoS;

- allowing the AGNA project manager and employees to frequent brothels notorious for housing trafficked women in violation of the Trafficking Victims Protection Act, and shutting down Plaintiff's efforts to investigate and put a stop to these violations;

- deliberately withholding documents relating to reports of violations of the Trafficking Victims Protection Act by AGNA's Program Manager and other AGNA employees and other acts of misconduct under the contract when responding to a document demand from Congressman Henry Waxman on behalf of the Congressional Committee on Oversight and Government Reform;

- endangering the safety of the guard force during transport to and from the Embassy by attempting to substitute company-owned, subpar, refurbished vehicles from Iraq rather than purchasing armored escort vehicles as promised to DoS, despite Defendants' awareness that without proper escort vehicles the transportation of guards would remain, in Defendant AGI's own words, "a laughing matter within the Kabul private security industry";

- knowingly using DoS funds to procure cheap counterfeit goods from a company in Lebanon owned by the wife of AGNA's Logistics Manager; and

- Defendants' practice of attempting to maximize profit from the contract with reckless disregard for the safety and security of the guard force, the U.S. Embassy, and its personnel.

4.      Plaintiff, who on paper was also supposed to oversee AGNA's performance on a $24.9 million Department of Defense ("DoD") contract to provide Naval support in Bahrain ("NSA Bahrain contract"), also objected to the management and control by Defendant AGI – a company incorporated in the United Kingdom – of AGNA's contracts to provide security for both the U.S. Embassy in Kabul and the U.S. Navy in Bahrain in violation of the requirements of federally mandated Proxy Agreements designed to ensure that companies like AGNA, which perform classified contracts, are effectively insulated from foreign control or influence.

5.     Plaintiff vigorously complained of Defendants' improper activities to Defendants and to DoS, attempted to correct AGNA's numerous deficiencies, insisted that Defendants refrain from making material misstatements and omissions to Congress, and made clear to Defendants that he would not communicate false information to DoS.

6.     In retaliation for these protected disclosures, his refusals to violate the law, his efforts to stop violations of the False Claims Act, his investigation and reporting in furtherance of a potential action under the False Claims Act, and his disclosures to AGNA management and DoS about AGNA's violations of the Trafficking Victims Protection Act, Defendants conspired together to strip Plaintiff of his job duties, subject him to a hostile work environment, and drive him to an involuntary termination in an effort to silence him and conceal the unlawful practices he had identified. Defendants' termination of Plaintiff's employment is in keeping with their pattern and practice of retaliating against conscientious employees who raise concerns about and report to DoS AGNA's contractual and statutory violations and material misstatements to the U.S. government.

## Jurisdiction and Venue

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as these claims arise from violations of laws of the United States and related state statutes. This court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

8.     Venue is proper in this Court pursuant to 31 U.S.C. § 3732 and 28 U.S.C. § 1391. Defendants transact business in the District of Columbia. DoS and DoD contracts with private security firms are approved, executed, and funded through governmental offices in the District of Columbia. Additionally, acts proscribed by 31 U.S.C. § 3729 occurred in the District of

Columbia. AGNA's contracts with DoS and DoD were administered in the District of Columbia and Defendants addressed false statements within the meaning of 31 U.S.C. § 3729 to DoS and DoD in the District of Columbia.

## Parties

9.      Plaintiff James Gordon is a citizen of New Zealand and a resident of the Commonwealth of Virginia who resides at 8004 Langbrook Road, Springfield, Virginia 22152. Prior to joining ArmorGroup, Mr. Gordon spent four years as a Commissioned Officer with the South African Defense Force, seven years as a Commissioned Officer in the New Zealand Army, and held high-level positions with defense security firms in Northern Iraq and Baghdad. In November 2004, Mr. Gordon began working for ArmorGroup Iraq, a subsidiary of ArmorGroup International, in the position of Operations Manager in Baghdad. In June 2005, ArmorGroup Iraq promoted him to the position of Director of Training. In July 2006, AGI promoted Mr. Gordon to the position of Regional Director of Training for ArmorGroup Middle East, where he directed all ArmorGroup training activities for the Middle East Area of Operations. In November 2006, AGNA recruited Mr. Gordon to serve as a Business Development Manager in its McLean, Virginia Office, where he was promoted to Director of Business Development in April 2007 and to Director of Operations in August 2007.

10.      Defendant ArmorGroup North America, Inc. ("AGNA") is incorporated in the State of Delaware and has its headquarters at 1420 Spring Hill Road, McLean, Virginia 22102. At various times, AGNA has been registered to transact business in the District of Columbia. AGNA presently transacts business with one or more agencies of the United States government, which are based in Washington, D.C., including DoS and DoD, and regularly transacts business in the District of Columbia.

11.     Defendant ArmorGroup International, PLC ("AGI") is a corporation formed under the laws of the United Kingdom, is based in London, and has its headquarters at Egginton House, 25-28 Buckingham Gate, London, United Kingdom, SW1E 6LD. AGI transacts business with the United States government directly and conducts business through its subsidiary, AGNA. AGI regularly transacts business in the District of Columbia.

12.     Defendant Wackenhut Services, Incorporated ("WSI"), a subsidiary of the Wackenhut Corporation, is incorporated in the State of Florida and has its headquarters at 7121 Fairway Drive, Suite 301, Palm Beach Gardens, Florida 33418. The Wackenhut Corporation is a subsidiary of Defendant G4S, PLC, which acquired Defendant AGNA on or about May 7, 2008. WSI assumed responsibility for administering AGNA's contract with DoS to provide security services to the U.S. Embassy in Kabul and AGNA's NSA Bahrain contract with DoD. WSI is registered to do business in the District of Columbia. It presently does business with one or more agencies of the United States government, which are based in Washington, D.C., and regularly transacts business in the District of Columbia.

13.     Defendant Jerry Hoffman is a citizen of the Commonwealth of Virginia and resides at 8601 Trabue Road, Richmond, Virginia 23235. Mr. Hoffman assumed the role of Interim CEO of AGNA in December 2007, and held that role at all times relevant to the Complaint. Mr. Hoffman regularly transacted business in the District of Columbia on behalf of Defendant AGNA.

14.     Defendant Cornelius Medley is a citizen of the Commonwealth of Virginia and his business address is 1420 Spring Hill Road, McLean, Virginia. Mr. Medley assumed Mr. Gordon's duties in February 2008.

## Statutory and Regulatory Background

15.     Mr. Gordon's whistleblowing activities centered on two contracts between the United States and Defendant AGNA—the Kabul Embassy contract and the NSA Bahrain contract.  In performing these contracts, Defendants not only violated their terms and conditions but also failed to adhere to governing statutory and regulatory requirements, including those set out in paragraphs 16 to 20 below.

### a.     The Trafficking Victims Protection Act

16.     The Trafficking Victims Protection Act ("TVPA") and its implementing regulations provide that that the United States has adopted a "zero tolerance policy" regarding trafficking in persons.  The TVPA and its implementing regulations prohibit Contractors, like AGNA, AGI, WSI, and their employees, from engaging in severe forms of trafficking in persons and from procuring commercial sex acts during the period of performance of the contract.  The Contractor must inform its employees of these prohibitions and the corrective actions that will be taken against violators, including removal from the contract, reduction in benefits, or termination of employment.  The Contractor must notify the Contracting Officer immediately of any information it receives from any source that alleges a Contractor employee has engaged in prohibited conduct and the corrective actions taken, if any, by the Contractor against the employee.  A Contractor's failure to comply with these requirements may result in suspension of contract payments, loss of award fees, termination of the contract, suspension or debarment.  48 C.F.R. 22.17.

17.     According to DoS's 2008 Trafficking in Persons Report, Afghanistan is a destination for women and girls from China, Iran, and Tajikstan trafficked for commercial sexual

exploitation.  Afghan children also are trafficked within the country for commercial sexual exploitation.

### b.   The FOCI Program

18.     To safeguard the United States' national security interests, U.S. subsidiaries of foreign corporations may not be awarded government contracts that require facility clearances ("classified contracts") unless the U.S. company effectively insulates itself from foreign ownership, control or influence (" FOCI").  A U.S. company is considered under FOCI whenever a foreign interest has the power, direct or indirect, whether or not exercised, to direct or decide matters affecting the management or operations of that company in a manner which may result in unauthorized access to classified information or may affect adversely the performance of classified contracts.

19.     To insulate U.S. subsidiaries of foreign corporations from FOCI and thus allow them to bid on and perform classified contracts, the foreign owner may enter into a Proxy Agreement whereby it relinquishes to cleared U.S. citizens approved by the U. S. Government most rights associated with ownership of its U.S. subsidiary.  These citizens, known as Proxy Holders, are granted authority to exercise the foreign owner's voting rights in the U.S. subsidiary.  Proxy Agreements require the implementation of procedures to prevent the foreign owner from controlling or influencing the performance of the classified contract.  The U.S. subsidiary must be organized, structured, and financed to be capable of operating as a viable business entity independent from the foreign owner.

20.     Both the Kabul Embassy and NSA Bahrain contracts are classified contracts.  At all times relevant to this complaint, AGNA was owned by a foreign corporation, AGI.

Accordingly, AGNA was required as a condition of its contracts to insure that AGI did not control or influence the performance of these classified contracts.

**Factual Allegations**

**To Win the Kabul Embassy Contract, Defendants Deliberately Underbid the Contract and Lied to the Department of State about AGNA's Performance Capabilities.**

21.    On or around April 16, 2006, DoS sent out a Request for Proposal ("RFP") to provide local guard and security services to the U.S. Embassy in Kabul, Afghanistan. The RFP's Performance Work statement provided that the U.S. Mission "requires the operation and management of a highly-trained, professional security force, hereinafter referred as the Embassy Security Force." The RFP described the scope of work as follows: "The Embassy Security Force shall provide 24-hours a day deterrent against the unauthorized, illegal, or potential life-threatening activities directed to the Mission's employees and subcontractors, visitors, sensitive information, and properties in and around the U.S. Mission in Afghanistan. These offenses include, but are not limited to, unlawful entries, terrorist attacks, assassination attempts, theft of property and/or classified materials, and unlawful destruction of public properties. The Contractor is required to recruit, train, and manage the armed professional security personnel and supervisory employees utilized in this effort."

22.    In response to the RFP, Defendants AGI and AGNA, through the assistance of James D. Schmitt, then Vice President of Business Development for AGNA, submitted a bid for this government contract, in which they knowingly made exaggerated and demonstrably false statements about AGNA's ability – including its capacities, experience, staffing capabilities, equipment, personnel, and facilities – to provide a guard force to protect the U.S. Embassy in Afghanistan. Defendants' bid included material false statements about Camp Anjuman, a two-acre base modestly comprised of a series of trailers that served as Defendant AGI's base of

10

operations in Afghanistan. The bid also made outlandish misrepresentations about AGNA's infrastructure, government contacts, ISAF/NATO contacts, equipment, and support personnel. Defendants seriously underbid the contract with DoS in order to secure it.

23.     In early 2007, AGNA hired James Sauer, Peter Martino, and John Gorman, who had given lengthy and distinguished service in the United States Marine Corps, to serve as the onsite Project Manager, Deputy Project Manager, and Camp Manager, respectively, of the DoS contract. Between February and April 2007, Messrs. Sauer, Martino and Gorman deployed to Afghanistan in preparation for AGNA's scheduled July 1, 2007 takeover of guard and security services for the U.S. Embassy.

24.     Upon their arrival in Afghanistan, up until the date of their unlawful terminations on June 13, 2007, Messrs. Sauer, Martino and Gorman raised significant concerns, on almost a daily basis, with senior management of the ArmorGroup Defendants about AGNA's inability to provide appropriate protection for the U.S. Embassy and Embassy personnel, to no avail. They objected to Defendants' attempts to enhance AGNA's profits by significantly altering the work schedules of the guard force. Over their heated objections and in contravention of the DoS RFP, which was designed around an 8-hour-day shift schedule, the ArmorGroup Defendants implemented plans requiring more hours per individual and fewer shifts of staff in order to cut costs and maximize their profit margin. By violating the maximum workable hours per week, as mandated by the DoS contract, AGNA was able to cut the needed guard force by approximately twenty percent, resulting in a substantial savings to AGNA.

25.     Messrs. Sauer, Martino and Gorman repeatedly raised concerns with the ArmorGroup Defendants that the AGNA shift rotation plan, which cut one guard shift from the schedule, was in violation of AGNA's contract with DoS, would weaken security at the U.S.

Embassy, and would effectively wipe out AGNA's ability to reinforce the U.S. Embassy in the event of an attack. In response to their expressions of concern, ArmorGroup Defendants' executives insisted that they implement such workforce plans and conceal their actions from U.S. Embassy and other DoS personnel.

26.     By email dated March 11, 2007, Mr. Sauer raised concerns about AGNA's screening and ability to hire personnel to staff up the contract. In response, by email dated March 11, 2007, AGNA Vice-President of Operations Michael O'Connell advised Mr. Sauer that the "main concern" for AGNA President Semancik is that Defendant AGI's "Business Development guys developed the transition budget w/o input from you or the Ops folks" and the budget "may be SIGNIFICANTLY below what is required for you to stand this program up." He went on to explain that "AGNA bid this at a very low price and a very low margin… which means that if we don't adhere to the transition budget closely … we/you are going to take a huge hit in the profit on year one." He stated: "I'm sure you won't give a rats (sic) if you have to take a huge hit but Karl [Semancik] is now the CEO and ultimately responsible for your program which means that Karl will have to take a huge hit from London and there's the rub." In ending this email, Mr. O'Connell stated: "You made an observation that 'Anjuman [AGI's base of operations] is not as well flushed out as some of you may think.' I would suggest that you consider that a universal law for all support you require and expect."

27.     The following day, Mr. O'Connell admitted to Mr. Sauer that the timelines and resources in AGNA's proposal to DoS "don't match up," which he described as "[p]robably not a big deal unless COR [the DoS Contracting Officer's Representative] calls us on it." He then encouraged Mr. Sauer to assure DoS, falsely, that AGNA had recruited and was in the process of vetting appropriate personnel. In response to Mr. Sauer's complaints to Mr. Semancik about the

ArmorGroup Defendants' deceptive business practices, Mr. Semancik explained in a March 17, 2007, email exchange that AGNA had seriously underbid the proposal to provide security for the U.S. Embassy in Kabul. In response, Mr. Sauer told Mr. Semancik that it would be preferable "to pull out of the contract than to jeopardize the Embassy security." Mr. Semancik acknowledged that he was not sure that AGNA could do the project successfully.

28.     By email dated March 30, 2007, to Mathew Brabin, Chief Financial Officer of Defendant AGI, copied to Messrs. Semancik and O'Connell, Mr. Sauer once again objected to the staffing and proposed rotations of the U.S. Embassy, including salary-cutting decisions made by Defendant AGI to ensure a greater profit margin for AGNA.

29.     By email dated April 1, 2007, Mr. O'Connell emphasized that despite the formidable problems that AGNA was having in complying with the contract, he had little concern that DoS would actually pull the contract from AGNA because the DoS contracting officer was "under severe pressure to make it work" given the intense Congressional scrutiny for all procurements out of his office as a result of Blackwater. Mr. O'Connell subsequently admonished Mr. Sauer not to tell U.S. Embassy personnel that AGNA had problems with staffing under the contract.

30.     Messrs. Sauer and Martino also clashed with Mr. Semancik and Mr. O'Connell about: 1) AGNA's failure spend sufficient funds to acquire appropriate armored vehicles to safely move the guard force to and from the U.S. Embassy; 2) AGNA's failure to implement a strict policy to ensure that the safety and security of the U.S. Embassy and its personnel were not compromised by the guard force's off-hours activities; 3) AGNA's failure to ensure that "Moderate Risk Public Trust" security clearances were obtained for AGNA hirees before they were deployed to Afghanistan; and 4) AGNA slashing Gurkha salaries. Mr. Sauer advised them

13

that AGNA "needed to either fund the project correctly or pull out, given that the operational

chaos could lead to a loss of life." When the Gurkha guard force walked off the job in May 2007

because of the low wages and poor treatment they were receiving from AGI, Carol Ruart, AGI's

Human Resources Director, insisted that AGNA "lock [the Gurkhas] in their rooms until they

agree to work for less."

31.     During the period of May 25 through May 28, 2007, Mr. Semancik visited Kabul

to review AGNA's preparations to take over the security of the U.S. Embassy. Mr. Sauer

candidly informed him of the many serious issues that raised concerns about AGNA's ability to

effectively secure the U.S. Embassy. Mr. Sauer emphasized that he "had an obligation to the

Embassy and the U.S. taxpayers to ensure the safety of the Embassy, the embassy staff and the

workforce," and that he would have no choice but to disclose these problems to the Regional

Security Officer ("RSO") and DoS if security was going to be compromised. Mr. Semancik was

visibly angered by these comments and by Mr. Sauer's insistence that these issues be disclosed

to DoS and Embassy officials.

32.     By email dated May 31, 2007, to high-level AGNA and AGI managers, Mr. Sauer

stated that "there's one more thing that may be slipping the corporate mind: The U.S. Embassy

Kabul is a national security issue even more than a business issue." By email dated June 2,

2007, Mr. Sauer further sounded the alarm, informing Mr. Semancik that AGNA management

had "zero security experience" and transmitting a "Risk Register," which painted an extremely

negative picture of AGNA's progress under the contract and made clear that the situation could

only be mitigated by the infusion of significant funds. After not receiving a satisfactory response

from AGNA officials, Mr. Martino sent another email to Mr. Semancik and Mr. O'Connell dated

June 2, 2007, objecting to the Company's operations and inexperience. He urged them to hire

staff that had the requisite background in the theater of operations to be qualified to make decisions that "take into account operational risk and not just corporate financial risk." Despite the urgency of their requests for AGNA to come into compliance with the DoS contract, Defendants ignored their warnings and grew increasingly hostile to Messrs. Sauer, Martino and Gorman.

33.     On June 9, 2007, Mr. Martino sent Mr. Semancik an email urging AGNA to mobilize resources to resolve problems with recruiting and vetting of personnel. He concluded that these were "monumental hurdles" to overcome that were not supportable by the resources AGNA had allotted in the budget. He urged AGNA to make a decision "to either INVEST in these items ... [to] successfully execut[e] this contract or face the reality that we are not properly funded or set up for successes."

34.     During this period, Messrs. Sauer, Martino and Gorman received reports that recruits for guard force positions who were then in pre-deployment training in Texas had been engaging in lewd, aberrant, and sexually deviant behavior, including sexual hazing, urination on one another and equipment, bullying, "mooning," exposing themselves, excessive drinking, and other conduct making them unfit for service on the contract. Messrs. Sauer and Martino immediately notified Mr. Semancik about these reports and objected vehemently to allowing those involved to deploy to Afghanistan. Mr. Semancik insisted that the men would be deployed given the chronic staffing shortages AGNA was experiencing.

35.     On June 12, 2007, Messrs. Sauer, Martino and Gorman confronted Mr. O'Connell, who had arrived in Kabul, about serious problems with the contract. Mr. Sauer questioned him about reports of aberrant and assaultive behavior being exhibited by personnel at AGNA's training facility in Texas during pre-deployment training. Mr. O'Connell told Mr.

15

Sauer that he did not need to worry about that issue, to which Mr. Sauer responded that he was

sure that the RSO would be concerned to learn that AGNA was aware of the situation and failed

to act.  Mr. Sauer further highlighted the dangers of allowing mentally unbalanced personnel to

come to Kabul and be armed, and insisted that he had an obligation to inform the RSO.  They

also advised Mr. McConnell that the staffing and shift rotation plan AGNA corporate officials

had come up with was "unrealistic and not in keeping with the requirements of the RFP."  Mr.

O'Connell rejected their concerns and charged that ArmorGroup was a "publicly held

corporation" and that their "ultimate responsibility" was to its investors.

### Upon Reporting to Embassy Officials that AGNA Had Put the Embassy at Risk in order to Preserve Corporate Profits, AGNA's In-Country Management Were Fired and Replaced by Managers Who Carried Out AGNA's Corporate Bidding.

36.     Messrs. Sauer, Martino and Gorman were disgusted by AGNA's "profit over

safety" mentality and concluded that they had a legal duty to report Defendants' fraudulent

misstatements concerning AGNA's capacities, qualifications and readiness to take over security

of the U.S. Embassy.  Accordingly, on the evening of June 12, 2007, they went to the U.S.

Embassy and reported their concerns verbally and in writing to the Assistant RSO Neil

Pietrowicz.  They informed him that AGNA personnel were not being properly screened and

vetted and complained about AGNA's hiring of an employee "who had been fired from a

previous project for pulling a pistol on another employee while drunk."  They further complained

that "the training program run for new hires has been plagued with hazing and intimidation of

students by students.  This included physical threats and perversions."

37.     Assistant RSO Pietrowicz advised them that given the seriousness of the concerns

they had raised, he would immediately report the information to the Regional Security Officer

and to the Department of State in Washington, D.C.  He informed them that the ArmorGroup

Defendants would be notified "at once" about the serious concerns Messrs. Sauer, Martino and Gorman had raised, and that the information they had provided would negatively impact on a separate $500 million proposal the ArmorGroup Defendants had submitted to provide security services in Iraq.

38.     On June 13, 2007, Mr. O'Connell terminated Messrs. Sauer and Martino and directed that they be confined against their will to the compound.  AGNA personnel then stripped them of their weapons, cell phones, computers, and vehicles, making it impossible for them to communicate with the RSO or other government officials, and forced them to fly out of Afghanistan.  AGNA pressured Mr. Gorman to tender his resignation and leave Kabul on the same flight as Sauer and Martino.  Later, Mr. Schmitt candidly admitted to Mr. Gordon that "AGNA cut them off at the knees" because "they had gone to the RSO to seek asylum."

39.     Following the terminations of Sauer and Martino and the forced resignation of Gorman, AGNA hired a series of rogue managers who flouted the terms of the DoS contract and brazenly violated the law.  AGNA installed Nick Du Plessis, a South African national, to replace Mr. Sauer as Program Manager, even though as a foreign national he was unable to obtain a U.S. security clearance, as required for the position.  AGNA chose Jimmy Lemmon to replace Mr. Martino as Deputy Program Manager.

**Defendants Failed to Recruit, Vet, Train and Staff the U.S. Embassy Guard Force Pursuant to DoS Contractual Requirements Resulting in the Issuance of a Cure Notice.**

40.     By letter sent to Mr. Semancik on July 19, 2007, with the subject "Cure Notice Issued Per FAR 49.402-3" ("Cure Notice"), DoS cited AGNA for violations of contract and security standards based on the matters raised by Sauer, Martino and Gorman, including serious deficiencies regarding personnel, training, equipment, armored vehicles, work hours, training facilities, and surveillance detection.  DoS Contracting Officer  Rogers stated: "I consider the

contract deficiencies addressed below to endanger performance of the contract to such a degree that the security of the US Embassy in Kabul is in jeopardy and that failure to correct the deficiencies immediately could result in termination of the contract for default…" He further noted that AGNA had underestimated the difficulty that it would encounter providing a security force in compliance with the contract terms and conditions, and that this failure "places the U.S. Embassy at some additional security risk since AGNA is not fully compliant with the terms and conditions of the contract at this time." He further objected to AGNA's failure to keep DoS apprised of potential noncompliance issues in writing, as required by its contract with DoS.

41.     In this Cure Notice, DoS enumerated dozens of serious deficiencies that compromised the security of the Embassy and required immediate corrective action by AGNA. The deficiencies identified by DoS included:  an inadequate number of relief guards; the failure to submit Moderate Risk Public Trust ("MRPT") packages to DoS for new personnel while transferring new personnel to Kabul before their MRPTs were approved; the employment of staff without the requisite security clearance; the failure to provide four out of seven armored vehicles required by the contract; the failure to provide weather-appropriate clothing and equipment; the lack of sufficient ammunition due to export licensing deficiencies; and the employment of staff members who were not fully briefed on the contract and did not understand its requirements, including the Program Manager, Mr. Du Plessis.

42.     In August 2007, AGNA responded to the Cure Notice by providing false information to DoS about AGNA's capabilities to cure the deficiencies under the contract and enumerated several courses of action which it claimed it would take to address them, including providing the requisite armored escort vehicles by August 2007.   Defendant AGI reviewed and approved this false submission to DoS.

43.     After submitting its response to the Cure Notice to DoS, AGNA promoted Mr. Gordon to the position of Director of Operations purportedly to implement AGNA's corrective action plan, which unbeknownst to Mr. Gordon it had no intention of doing.  Immediately upon assumption of the position of Director of Operations, Mr. Gordon sent an email dated September 3, 2007, to Program Manager Du Plessis and his staff stating:

> You can rest assured that there is no hiding of information from DoS.  Anyone who thinks that they can get away with this will probably end up in a Federal Penitentiary.  It is our duty to report on all aspects of the contract performance and we are required to be transparent and honest in our dealings.  Personally I wouldn't accept anything else.

Mr. Gordon's admonition to Mr. Du Plessis went unheeded.  For the remainder of his tenure at AGNA, Mr. Gordon was placed in the impossible position of trying to reign in a rogue Program Manager who refused to comply with mission critical terms of the Kabul embassy contract and who took his direction from AGI, the foreign parent corporation, while simultaneously dealing with corporate executives who were unwilling to spend the necessary funds to bring the contract into compliance.

44.     In the Cure Notice issued by DoS on July 19, 2007, Contracting Officer Rogers warned Defendants that the security of the U.S. Embassy was in jeopardy because Defendants had failed to provide a qualified and trained guard force, including relief guards, to safeguard the U.S. Embassy.

45.     During his seven month tenure as Director of Operations, Mr. Gordon worked diligently to rectify this critical contract breach and to properly recruit, vet, train and staff the Embassy guard force.  However, his efforts were stymied at every step of the way by AGI's refusal to expend the necessary resources to fulfill the contract requirements, as set forth in the examples that follow.

46.     From the outset, AGNA lacked the requisite necessary administrative staff to run the Kabul Embassy contract.  Instead, AGNA was little more than a shell company set up by AGI to bid for and obtain U.S. contracts that could only be awarded to American companies.  During most of Mr. Gordon's tenure, the entire AGNA staff in the United States consisted of 21 employees whose time was spent overseeing several U.S. contracts that had been awarded to AGNA.  Only two members of Mr. Gordon's staff were dedicated to the U.S. Kabul Embassy contract.  Although Mr. Gordon repeatedly informed AGI that AGNA could never bring the contract into compliance with the staff on hand, AGI Chief Operating Officer Noel Philp refused to permit AGNA to hire additional administrative staff.  One of the consequences of AGI's refusal to allow AGNA to hire an adequate number of administrative staff was that AGNA repeatedly failed to perform requisite background checks for new employees or even to contact prior employers.  This resulted in AGNA's hiring and training of unqualified personnel that lacked the requisite licenses and clearance and ultimately to the rejection by DoS of many of AGNA's proposed hires, including several with serious criminal records.  It also led to the hiring of personnel who had track records for engaging in misconduct, including drunken, lewd, and deviant behavior both at previous places of employment and during pre-deployment training.

47.     Determined to increase its "profit margin," AGI took over AGNA's responsibility for recruiting and hiring the Gurkha and non-U.S. expatriate guards.  (Gurkhas are people from Nepal and Northern India who are known for their history of bravery and strength in the Indian Army's Gurkha regiments and the British Army's Brigade of Gurkhas. The term "Gurkha" may also be used generically to describe guards from the region who are employed by private security contractors. There is a high degree of variability in the skills and training.) AGI's goal was to do this as cheaply as possible, regardless of whether the personnel recruited and hired were

qualified to assume the critical task of guarding the U.S. Embassy. AGI imposed several cost-cutting measures, such as reducing the proposed Gurkha salaries by half, eliminating an entire guard shift, and increasing guard shifts from eight to twelve hours in order to reap a greater profit margin for the company.

48.     AGNA subcontracted with AGI's subsidiary, International Training, Inc. ("ITI"), to provide training for AGNA recruits, including for the new hires that were reported to have engaged in lewd and aberrant behavior at ITI's training facility in Pearsall, Texas. Even before Mr. Gordon assumed responsibility as Director of Operations, he learned from Mr. O'Connell that an AGNA trainee had reported that he was subjected to sexual hazing and deviant conduct by other trainees while undergoing training at ITI and that former Program Manager James Sauer investigated and sought to address the matter. After becoming Director of Operations and assuming oversight responsibility for training, Mr. Gordon asked Mr. Semancik for a copy of Mr. Sauer's investigation into the hazing activities at ITI's training facilities. Mr. Semancik refused to provide Mr. Gordon with the report and instead told Mr. Gordon that the victim of the hazing – not the perpetrators – was the problem. Mr. Gordon told Mr. Semancik he strongly disagreed with Semancik's viewpoint and that AGNA should not countenance any hazing. Despite this warning from Mr. Gordon, Mr. Semancik failed to hold those who engaged in hazing accountable and instead permitted them to deploy to Kabul and remain as AGNA guards, thus preventing Mr. Gordon from taking action by withholding the requested reports.

49.     Mr. Gordon's efforts to address AGNA's failure to properly train new guards were likewise impeded. When Mr. Gordon insisted that AGNA set up the requisite training courses to get qualified guards on board, ITI resisted and in fact obstructed his efforts. Instead, the ITI representative who was supposed to assist in the training joked about how incompetent

AGNA was and noted that ITI was waiting for the company to fail.  ITI's failure to perform the requisite training in turn impeded Mr. Gordon's efforts to properly staff the guard force.  A DoS review of the training provided by ITI revealed that ITI had failed to review the contract training requirements and had used unqualified staff to conduct the training.

50.      Despite AGNA's representation in its contract proposal that it had a rigorous program to ensure that all guards assigned to the U.S. Embassy were able to converse in the required languages with employees and visitors while on posts and that it would conduct language proficiency tests for its TCN workforce, Defendants hired Gurkha guards who could not speak English.  AGNA falsified their language qualifications in its submissions to DoS.  When Mr. Gordon sought to ascertain what language tests had been administered to the workforce to determine whether their language skills complied with contract requirements, he learned that no language tests had been administered.  Mr. Gordon informed DoS of this contract violation and immediately sought to rectify it.  Subsequently, AGI hired a language teacher to perform language assessments who concluded that that the Gurkha workforce would need years of language training in order to meet the contract language requirements.

51.      Mr. Gordon repeatedly briefed AGNA and AGI executive about these serious contract breaches and sought assistance in rectifying them.  During an AGNA Board meeting that took place in Washington, D.C. in late October or early November 2007, Mr. Gordon complained to AGI's CEO, David Seaton, as well as to Mr. Semancik and the AGNA Board about AGNA's improper recruiting and vetting of personnel for the U.S. Embassy contract and the serious manpower shortage.  Mr. Seaton falsely assured Mr. Gordon that he would ensure that improvements were made.

22

52.     Mr. Gordon sought to keep DoS informed about the critical shortage of guards and the potentially disastrous consequences it posed for the Embassy's security. For example, in an email from Mr. Gordon dated September 6, 2007, to the Contracting Officer's Representative discussing AGNA's firing of two members of its guard force, Mr. Gordon that there was not a single relief guard available should AGNA have to replace any other guards. He stated:

> "For now we are OK but if one person gets sick or slips on a banana peel the whole thing falls apart like a cheap suit."

In response, the Contracting Officer's Representative glibly stated, "Lock up the banana supply."

### Defendants Attempted to Conceal from DoS AGNA's Failure to Renew AGNA's ITAR License.

53.     Under the International Traffic in Arms Regulations (ITAR), a set of U.S. government regulations that control the export and import of defense-related articles and services, AGNA was required to possess a license issued by the United States Directorate of Defense Trade Controls to conduct training of non-U.S. personnel for the performance of guard services at the U.S. Embassy in Kabul and to export munitions from the U.S. to Afghanistan for training.

54.     On October 19, 2007, AGNA became aware that it had allowed its ITAR license to lapse on August 31, 2007. After learning of this, Mr. Gordon ordered a halt to all training of non-U.S. personnel until the issue was resolved. Mr. Semancik discussed this problem with AGI's CEO, Mr. Seaton, who told him that AGNA should delay disclosing the ITAR lapse to Contracting Officer Rogers pending further word from the Directorate of Defense Trade Controls about how long it would take to renew the license.

55.     Immediately thereafter, Mr. Semancik informed Mr. Gordon that he planned to withhold the fact that AGNA had allowed its license to lapse from DoS in the hope that AGNA's license could be re-activated before DoS discovered what had occurred.  Mr. Gordon refused to be a party to this deception and warned Mr. Semancik that the suggested conduct was unlawful and could have dire repercussions for AGNA if it were discovered by DoS.  With Mr. Semancik's begrudging acquiescence, Mr. Gordon reported AGNA's violation to DoS by email dated October 26, 2007.  In response, DoS Contracting Officer Rogers informed AGNA that it was "in breach of contract" and that AGNA needed to remove the official responsible for the ITAR license lapse from "any position, authority or responsibility under my contract."

56.     In response to Mr. Semancik's admission to Mr. Rogers that he was personally responsible for the lapse in the license, Mr. Rogers instructed Mr. Semancik to submit a written explanation of how the ITAR license lapse had occurred and directed AGNA to keep DoS informed of any impact that this would have on the contract.  He emphasized that any future lapses of this nature would be seen in a very serious light, as without the appropriate ITAR licenses, it would be impossible for AGNA to perform on the contract.

### AGI Exercised Improper Management and Control Over AGNA's Contracts With Department of State and Department of Defense.

57.     Because AGNA's Kabul Embassy and NSA Bahrain contracts required a top secret facility clearance, AGNA was required as a condition of these contracts to ensure that its parent company, Defendant AGI, and its foreign subsidiaries were precluded from exercising control or influence over AGNA's contracts.  Pursuant to this legal mandate, AGI executed a Proxy Agreement, with the self-described purpose of insulating AGNA "from foreign ownership, control and influence by ArmorGroup International plc."  Under the Proxy Agreement, three

appointed Proxy Holders were granted authority to exercise all voting rights with respect to shares owned by AGI in AGNA.

58.     Contrary to Defendants' legal and contractual mandates, Defendant AGI exercised increasing control and influence over AGNA's performance on the NSA Bahrain and Kabul Embassy contracts, often to the detriment of both AGNA's ability to perform its contractual obligations and to Mr. Gordon's efforts to investigate, report, and rectify contractual and statutory violations committed by Defendants.

59.     By email dated October 20, 2007, from Mr. Gordon to Mr. Semancik, Mr. Gordon objected to AGI's control and of interference in the administration of AGNA's contract with DoD and expressed frustration with AGI's utter disregard for the restrictions imposed by the United States Government pursuant to its Foreign Ownership, Control, or Influence (FOCI) Program. Mr. Gordon stated: "The whole FOCI thing and how London chooses to apply it, or not, is getting very tir[ing]. I am exhausted by the continual struggle that is brought about by the lack of decision making and clear guidance from the corporate body that should be communicated to the entire company so we do not have to fight a new battle with each project and each regional entity with every contract or support issue."

60.     In response to this email, Defendant Semancik attempted to convince AGI to bring "reporting lines" on the NSA Bahrain contract into compliance "with USG (U.S. Government) requirements." This effort proved fruitless. By email dated October 21, 2007, to Mr. Semancik and Mr. Gordon, Jon Knight, AGI's Middle East Regional Director, insisted, "I intend [on] standing firm on who manages and executes the delivery piece of our contracts going forward—it has to be the region and countries (AGI and its foreign subsidiaries) – without complicating issues whilst observing Proxy and FOCI issues. **I believe AGNA is neither**

**structured nor able to execute these follow on phases after contract bid compilation and success at present** and there will need to be a structural change invoked by the board to clarify reporting lines. From my perspective the reporting line outlined in broad terms in my email will be what I wish to follow for operational services simplicity/control and quality delivery." (emphasis added). Over Mr. Gordon's objections, Mr. Semancik acquiesced to AGI's insistence that it continue to administer and control the NSA Bahrain contract.

### Defendant AGI Routinely Operated in Violation of the Proxy Agreement With Respect to the Kabul Embassy Contract in Order to Suppress Mr. Gordon's Investigation of Improper Activities Under the Contract and to Prevent Him from Reporting AGNA's Misconduct to DoS.

61.     AGNA's operational policies and procedures, as described in an email from Mr. Semancik dated October 10, 2007, required that certain field incidents, including those that involved the escalation of force or could result in adverse publicity, be formally reported without delay to AGNA corporate management in Virginia. These incidents were to be "thoroughly investigated by senior management" with Mr. Gordon, as Director of Operations, "determin[ing] who conducts the investigations." Contrary to this policy and to FOCI program requirements, AGI routinely interfered with and usurped Mr. Gordon's management function to oversee the investigation of incidents in the field. As the incidents grew more serious, AGI's control over this critical responsibility grew more heavy-handed.

62.     On October 10, 2007, AGNA's guard force in Kabul was involved in a number of serious incidents which included: 1) the detention by AGNA guards of a group of Afghan civilians and their involuntary transport to the U.S. Embassy; 2) a verbal and physical altercation between AGNA guards and an Afghanistan Ministry of Interior policeman in which the guards handcuffed the policeman; 3) a confrontation between AGNA guards and an Afghani General and several Ministry of Interior policemen; and 4) the refusal of AGNA guards to obey an order

26

given by the U.S. Regional Security Officer order to withdraw from a checkpoint in order to defuse a potentially explosive situation.

63.     In an email written that same day, Defendant Semancik castigated Program Manager Du Plessis for failing to report these incidents to AGNA corporate headquarters in a timely manner.  Defendant Semancik directed Mr. Gordon to travel immediately to Kabul to conduct an investigation.

64.     After being apprised of this planned course of action, AGI CEO Mr. Seaton and AGI Chief Operating Officer Mr. Philp countermanded Mr. Semancik's order.  By email dated October 11, 2007, Mr. Seaton stated that he did not "see the merit of James deploying to Kabul" and advised "everyone to let the dust settle for a day or two."  Mr. Seaton further stated that emphasis should be placed on "better utilising and collaborating with [AGI's foreign subsidiaries] on the ground."  The interference by AGI in this matter and the course of action suggested by its executives contravened the legal requirements that AGNA manage the U.S. Embassy contract without control by and influence of Defendant AGI.

65.     In or around October 13, 2007, Mr. Gordon and Hal Simpson, AGNA's Training and Deployment Manager, attended a meeting with DoS contracting officer Paul H. Desilets in which Mr. Desilets berated Mr. Gordon for failing to ensure that the Program Manager had provided adequate information about incidents in theater for inclusion in AGNA's reports to DoS.  Mr. Desilets directed AGNA to take steps to ensure that Mr. Du Plessis was adhering to contract reporting requirements "pretty damn quickly" or to terminate his employment.  By email dated October 14, 2007, Mr. Gordon informed Mr. Semancik that DoS had requested that AGNA either "1. Recalibrate the PM 'and do it pretty damn quickly', or 2. Get rid of him."  Mr.

Semancik refused to do so because, upon information and belief, AGI insisted that AGNA retain Mr. Du Plessis.

66.     Increasingly concerned that AGNA was not properly investigating incidents that occurred involving the U.S. Embassy contract, Mr. Gordon sent an email to Mr. Semancik on October 12, 2007, which was forwarded to AGI CEO Mr. Seaton, with the subject line "Transparency and Corporate Responsibility – For Dave Seaton." Referencing the heightened Congressional scrutiny that members of the private security companies were facing, Mr. Gordon emphasized that "Congressman Waxman and his colleagues were particularly concerned about how incidents were dealt with after the fact. Questions focused on determining what actions company management may have taken to ensure that individuals were held accountable for their actions and what corrective measures were established to ensure that if an individual was at fault that the situation did not repeat itself." Mr. Gordon warned that "[i]nvestigations…where required must be carried out without delay and should be thorough…If we fail to be thorough and deliberate in our actions we will serve to place the company at risk."

67.     Mr. Gordon's warnings went unheeded, and as a result of AGI's interference, AGNA's corporate management was blocked from investigating the events of October 10, 2007, despite ongoing concerns that the events would affect the overall security of the U.S. Embassy.

**Defendants Suppressed Reports About AGNA's Violations of the Trafficking Victims Protection Act and Obstructed Plaintiff's Efforts to Conduct a Meaningful Investigation into Such Activity by AGNA's Project Management.**

68.     On or about November 8, 2007, Deputy Program Manager Jimmy Lemon informed Mr. Gordon and Puja Power, the Acting Director of Human Resources, that AGNA's Armorer (the official in charge of the upkeep of small arms, machine guns, and ammunition) was not properly performing his duties and had recently been forcibly removed during work hours

from a brothel in Kabul. Mr. Gordon instructed Ms. Power to initiate action to terminate the Armorer at once.

69.     A short time later, Ms. Power reported to Mr. Gordon that when she confronted the Armorer about his misconduct, he stated that he could not be terminated because Program Manager Du Plessis and AGNA medic Neville Montefiore had frequented these brothels with him. Mr. Gordon knew that the procurement of commercial sex acts by AGNA employees violated the laws of the United States and the Kabul Embassy contract. He was concerned both because the frequenting of brothels by AGNA personnel raised security concerns about the guard force's ability to safeguard the U.S. Embassy and because it was well-known that young Chinese girls were trafficked to Kabul for commercial sexual exploitation, in violation of the Trafficking Victims Protection Act.

70.     Mr. Gordon was especially alarmed because the Program Manager himself, the top manager in Kabul overseeing the guard force, had been identified as a participant in these unlawful activities. Mr. Gordon realized that if AGNA did not conduct a thorough investigation and terminate the wrongdoers, members of the guard force would perceive AGNA's inaction as a license to engage in similar unlawful activities.

71.     Mr. Gordon immediately reported the information he had received from Ms. Power to Mr. Semancik and to DoS and recommended that AGNA's corporate management commence a thorough investigation of the matter. Mr. Gordon proposed that either he or AGNA's Deputy Director of Operations Gregory Vrentas, a former U.S. Army Lieutenant Colonel with the Office of Military Cooperation-Afghanistan, direct the investigation. Mr. Semancik concurred that this was the appropriate course of action.

72. Once again, however, AGI obstructed Mr. Gordon's efforts to insure that AGNA conducted a full investigation and reported all information to DoS. Shortly after receiving Mr. Gordon's recommendation, Mr. Semancik informed Mr. Gordon that AGI officials had rejected his plan for either him or Mr. Vrentas to direct the investigation, and instead decided that AGI Chief Operating Officer Noel Philp and AGI Director of Operations Nick Powis would handle the investigation themselves. This plan of action was in direct contravention of both AGNA's policies and the FOCI program requirements.

73. Around the same time, Chris Duffy, a temporary medic for AGNA who had relieved Mr. Montefiore while he was on leave, found a number of irregularities and anomalies in the delivery of medical services, including the improper storage of regulated narcotics such as morphine. He also noted that there had been an outbreak of sexually transmitted diseases ("STDs") among AGNA workers in 2007. Mr. Duffy reported this to Mr. Powis in London, who in turn informed Mr. Gordon during a routine telephone call that these issues had been uncovered.

74. As a condition of the Kabul Embassy contract, AGNA was required to report any outbreak of communicable diseases to DoS, and Mr. Gordon immediately brought this contractual requirement to the attention of Mr. Semancik. Mr. Gordon reiterated that the frequenting of brothels by AGNA personnel, a likely explanation for the STD outbreak, constituted a violation of both the DoS contract and U.S. law. Mr. Semancik communicated this information to Mr. Philp and Mr. Powis.

75. Subsequently, Messrs. Philp and Powis claimed to conduct an investigation into the allegations that AGNA employees, including the Program Manager, had violated the

Trafficking Victims Protection Act. Mr. Gordon was denied access to the investigative reports or any information about the nature or extent of the investigation.

76.    The only document provided to Mr. Gordon was a three-page report of the findings of Messrs. Philp and Powis entitled "Investigation into allegations of misconduct by the PM of the ESEK contract, Afghanistan," dated November 14, 2007. The report stated that Program Manager Du Plessis was aware that "some members of workforce had abused the MWR (Moral, Welfare and Recreation) policy for the purpose of seeking out prostitutes, but this represented only a minority against the **overall net benefit of having a 'light-touch' MWR policy**" (emphasis added). No mention was made of the fact that the conduct at issue violated the Trafficking Victims Protection Act's blanket prohibition of the procurement of commercial sex acts and DoS's "zero tolerance" policy for violations of this law. The report also stated that the Program Manager admitted that members of the workforce had suffered venereal disease in 2006 and 2007 but failed to address any issues raised by this disclosure, including why the Program Manager had not reported this information to AGNA corporate management for investigation and transmission to DoS, and what steps, if any, were taken by the Program Manager to address the issue.

77.    The only corrective action taken per the report was to direct the Program Manager to revise the MWR policy, which had allowed AGNA personnel to frequent bars, restaurants and other places in which human trafficking activity occurred. The report also stated that because the Program Manager "was aware of the possibility of un-sanctioned activities that could bring discredit on both the company and the client," AGNA had issued a formal letter of sanction and warning for inclusion in the Program Manager's personnel file.

78.     Finally, the report stated that Messrs. Philp and Powis "discussed the issue of MWR and the PM leadership of the project" with the Regional Security Officer (RSO) for DoS.

79.     Upon information and belief, Defendants failed to inform the RSO or the Contracting Officer in writing that: 1) AGNA's Armorer had violated the Trafficking Victims Protection Act; 2) the Armorer had stated that AGNA's Program Manager and Medic had engaged in the same illegal activity; and 3) AGI's investigation revealed that members of AGNA's workforce had frequented brothels and had suffered outbreaks of STDs, and that the Program Manager knew about it.

80.     On November 13, 2007, Mr. Beese, AGI's then-Chief Administrative Officer, forwarded an article to Messrs. Philp and Powis regarding trafficking of women in Kabul. Specifically, he noted that "we need to be aware of the allegation in the article below because visits to 'Chinese girls' may not only be prejudicial to security, but be in breach of international laws against 'Trafficking.'" The article recounted how Chinese girls were promised work as waitresses in Dubai but instead were transported to Kabul and forced into prostitution.

81.     After receiving a copy of Mr. Beese's email, Mr. Du Plessis sent an email to Messrsr. Philp, Semancik, Gordon and others dated November 23, 2007, indicating that he had discussed amending AGNA's MWR Policy with AGI's CEO Mr. Seaton and AGI's Director of Operations and objected to AGNA giving DoS information about the investigation. He requested an opportunity to meet, and upon information and belief, did meet with AGI officials in London the following week, in violation of FOCI program requirements.

82.     Upon reviewing AGI's so-called investigative report, Mr. Gordon became extremely disturbed by AGI's apparent failure to perform a meaningful investigation of the serious violations of law alleged to have been committed and AGNA's failure to make full

disclosure to DoS.  Mr. Gordon vigorously complained to Mr. Semancik about AGI's decision to protect Mr. Du Plessis from termination or meaningful disciplinary sanctions.  Mr. Semancik and Mr. Gordon discussed this issue with Mr. Beese, AGI's Chief Administrative Officer, who directed them to retain Mr. Du Plessis and take no further disciplinary action.

83.     On or about November 14, 2007, Mr. Gordon held a counseling session with Mr. Du Plessis in which he informed him that AGNA was issuing a formal letter of sanction and warning to him for inclusion in his personnel file.  Mr. Du Plessis objected to the issuance of the warning letter and asserted both during the oral counseling session and in the Employee Comments portion of the counseling report that "President Karl Semancik was fully aware of the MWR policy from inception" and that AGNA personnel were frequenting brothels.  He further insisted that "boys will be boys."  Mr. Gordon found his attitude to be one of shocking disregard for legal requirements and oblivious to the issue of how such conduct could impair the reputation of the United States and ultimately jeopardize the security of the U.S. Embassy.

84.     Both during the course of the counseling session and in the Employee Counseling report itself, Mr. Du Plessis was directed to revise and promulgate a new MWR policy, to be ratified by both AGNA and AGI, that "does not allow for any activities which compromise the reputation of the Department of State or ArmorGroup."  Mr. Du Plessis failed to comply and AGNA employees continued to frequent brothels in Kabul.  Ultimately, Mr. Gordon promulgated a new MWR policy which explicitly banned AGNA employees from visiting brothels.  Upon information and belief, AGNA personnel continued to frequent brothels in Kabul with some degree of regularity through much of 2008, and thereafter, arranged for prostitutes to come to Camp Sullivan.

**In Order to Inflate AGI's Balance Sheet in Preparation for the Sale of AGI
and its Subsidiaries, Defendants Directed AGNA to Make
Misrepresentations to DoS to Obtain Funds Due to AGNA that had been
Withheld by DoS for Non-Compliance with the Contract.**

85.     Throughout the fall of 2007, AGNA routinely delayed sending invoices to DoS

because the data received from Mr. Du Plessis about personnel and hours worked did not

comport with the time cards. When invoices were submitted, DoS's audits revealed errors and

therefore routinely rejected them.

86.     On November 27, 2007, AGI announced that its operating profits had dropped

from the prior year and that CEO Seaton had been asked to resign. AGI blamed its declining

profits in part on the "onerous administrative and human resource requirements for the US

Embassy contract in Afghanistan, which have had a significant impact on the profitability of its

operations in the country." AGI further announced that AGI had "recently restructured the

management team involved in running the contract and believes that this strategic project will

become profitable in the early part of 2008."

87.     On or around December 3, 2007, Mr. Semancik informed Mr. Gordon and

AGNA's Finance Manager Mark Power that if AGNA failed to secure the release of the funds

from DoS that had been withheld because of lack of paperwork, AGNA would not survive. Mr.

Philp echoed that view, warning that AGNA would have to consider defaulting on the contract if

Mr. Gordon could not get DoS to release funds so that AGNA could meet its payroll and pay its

outstanding bills.

88.     Defendants were aware that one issue of extreme concern, both to DoS and to the

AGNA workforce, was that the troop transport vehicles used by AGNA to transport its guard

force to and from the U.S. Embassy were easily identifiable and of such poor quality that they

were vulnerable to attack. In fact, the transport vehicles were considered so unsafe that they

were referred to by the workforce as the "white coffins" and "white elephants," and AGNA's

shift-change procedures were described by an AGI Project Coordinator as "somewhat of a

laughing matter within the Kabul private security industry at present." In addition to fearing for

the workforce's safety, both AGNA and DoS were concerned that the workforce used overly-

aggressive tactics in responding to incidents during transport because it felt exposed and

unprotected. To remedy this dangerous situation, AGNA had agreed in early 2007 to purchase

armored escort vehicles to safeguard the troops during transport. Although a supplier for the

escort vehicles had been contacted, AGNA had insufficient funds on hand to make the purchase

and troops continued to be transported in hazardous vehicles, which was a matter of grave

concern to Mr. Gordon

89.     As a "sweetener" to induce DoS to release the withheld funds, Defendants

directed Mr. Gordon to promise DoS that if the funds were released they would be used, in part,

for the immediate purchase of the critically needed armored escort vehicles. On December 5,

2007, Mr. Gordon appealed to DoS Contracting Officer Rogers to release some of the funds due

to AGNA and assured him that a portion of the released funds would be used to procure the

armored vehicles that AGNA had agreed to purchase. Mr. Gordon also represented, per his

instructions from Defendants, that the monies would be used to meet payroll and pay AGNA's

outstanding invoices. Mr. Gordon advised Mr. Rogers that if AGNA did not receive payment of

the outstanding invoices immediately, its financial crisis would most likely lead the company to

default on the contract. Mr. Gordon successfully convinced DoS to release the approximately

$5.5 million in contract funds based on these representations, which it did on December 6, 2007.

Unbeknownst to Mr. Gordon, at the time he made these representations to Contracting Officer

Roger, AGI had no intention of permitting AGNA to retain the released funds to pay AGNA's

outstanding bills and honor its contractual commitments. Rather, as soon as the money was

transferred into AGNA's account, AGI's Chief Financial Officer, Matthew Braben, directed

AGNA's Finance Manager to send AGI all funds AGNA received from DoS, leaving AGNA

without funds to pay its bills and to purchase the requisite armored escort vehicles.

90.     Mr. Gordon was outraged that he had been set up by AGI to dupe DoS to release

funds by falsely representing how the funds were to be used. AGNA's Proxy Holders expressed

complete surprise at AGI's action and indicated that they had no advance knowledge of AGI's

plan to appropriate the monies.

91.     In lieu of purchasing the required armored vehicles as AGNA promised DoS it

would do, AGI sought to transfer subpar, refurbished AGI vehicles from Iraq that did not come

close to meeting the workforce needs. By email dated December 11, 2007, Mr. Gordon told

AGNA's Proxy Board and Mr. Semancik that "delivering a second rate solution…isn't going to

cut mustard."

### Mr. Gordon Informed AGI and AGNA Executives That He Would Not Make Misrepresentations to DoS.

92.     By December 2007, it became clear to Mr. Gordon that AGNA intended to

continue misleading DoS about its compliance with the contract and the illegal activities in

which it had engaged under the contract. Mr. Gordon feared that he would unwittingly be placed

again in the position of making misrepresentations to DoS about commitments to cure

contractual deficiencies that Defendants never intended to honor. Indeed, by this time, Mr.

Gordon was extremely concerned that AGNA was not trying to come into compliance with

contractual requirements at all but was instead seeking to maximize "the bottom line" while the

ArmorGroup Defendants engaged in active negotiations to sell their company to the London-

based security services company G4S.

36

93.     On December 19, 2007, Mr. Gordon informed AGNA's Financial Director Mark

Power that he did not believe that AGNA would investigate or put a halt to the illegalities he had

identified or honor its commitments to DoS to bring the contract into compliance.  Mr. Gordon

specifically stated that he would no longer make representations to DoS about AGNA's

contractual compliance and the steps that it would take to achieve compliance, given its clear

intent not to follow through.

94.     On December 20, 2007, Mr. Gordon sent Mr. Semancik an email stating, "I will

talk to the [Proxy] board tomorrow but I can't go on like this."  Mr. Gordon also sent an email to

AGNA's Proxy Board members that same day saying that he could no longer "do business this

way.  I find myself in a position where I can not continue to work with a program management

team that is completely incompetent and my efforts to rescue this ill fated US Embassy contract

continue to be undermined."

95.     In December 2007, AGI asked Defendant Semancik to resign and subsequently

replaced him with Defendant Hoffman, a former Chief Executive Officer for AGI in London.  In

December 2007 and January 2008, Mr. Gordon met with Mr. Hoffman daily to discuss the Kabul

Embassy contract, including AGNA's failures to comply with material terms of the contract.

Mr. Gordon informed Mr. Hoffman that AGNA staff had frequented brothels and that Program

Manager Du Plessis routinely failed to comply with the incident reporting requirements of the

contract.

96.     Mr. Hoffman expressed support for Mr. Gordon's actions and acknowledged that

Mr. Gordon had established a good working relationship with the Contracting Officer Mr.

Rogers and DoS staff as a result of his diligent efforts to bring the contract into compliance.  He

also stated that he approved of Mr. Gordon's efforts to maintain strict control by AGNA over the

contract and his decision to take disciplinary action against Mr. Du Plessis. By email dated December 31, 2007, Mr. Hoffman assured Mr. Gordon that if Kabul staff did not carry out Mr. Gordon's instructions, they would be removed from the contract. Despite these assurances, the ArmorGroup Defendants continued to violate the DoS contract and Proxy Agreement requirements as disturbing new violations of the contract came to light involving allegations of counterfeit goods and violations of human trafficking laws.

**AGNA Purchased Counterfeit Goods with U.S. Funds and Concealed AGNA's Failure to Remove the Culpable Party from the Contract as DoS Had Directed it to Do.**

97.     By email dated January 10, 2008, Deputy Program Manager Lemmon informed Mr. Gordon that the cold weather clothing that Mr. Du Plessis had purchased under AGNA's contract with DoS was possibly counterfeit. He reported that the goods received were "knock offs," were "of inferior quality" and were "insufficient for winter wear in Afghanistan." Mr. Gordon relayed these developments to Mr. Hoffman, and in a meeting with Contracting Officer Rogers, he and Mr. Hoffman informed DoS that they were conducting an investigation into the procurement procedures followed in sourcing the items. Mr. Rogers noted that these counterfeit items would eventually revert to government ownership under the contract, to the detriment of the legitimate U.S. suppliers of the brands, and directed AGNA to conduct a full investigation.

98.     Mr. Gordon's inquiries revealed that Mr. Du Plessis had authorized Logistics Manager Sean Garcia to place the order for counterfeit cold weather clothing and boots through Garcia's wife's company, Trends General Trading and Marketing, LLC, which was based in Beirut and thereby banned as a contractor. Mr. Gordon consulted with North Face and Altama Boots, the companies whose goods had supposedly been purchased, and both companies confirmed that the items were counterfeit. Mr. Gordon ordered that a formal investigation be conducted by Defendant Cornelius Medley, then the Guard Force Commander and fill-in Deputy

Program Manager in Kabul.  He further instructed Mr. Medley to assume all of Mr. Garcia's

duties immediately.  Unbeknownst to Mr. Gordon, Defendant Medley was a crony of Messrs. Du

Plessis and Garcia and actively stonewalled his efforts to investigate this matter.

99.     By email dated January 24, 2008, Mr. Rogers directed that Logistics Manager

Sean Garcia be terminated from the contract.  Mr. Gordon immediately sent Mr. Du Plessis and

Mr. Medley an email, stating that the issue of the counterfeit goods "has the highest level of

attention at Department of State" and directing that "[a]s of receipt of this email, Sean Garcia

will hand over control of all logistics management to Cornelius Medley."  He provided DoS

Contracting Officer Rogers and DoS Program Officer Ms. McMichael with a copy of that

instruction.

100.     After informing DoS that Mr. Garcia had been relieved of his duties and receiving

Mr. Du Plessis' representation that "he had instructed Sean accordingly," Mr. Gordon learned

that Mr. Garcia continued to perform the duties of the Logistics Manager, including the oversight

of weapons and ammunition, in violation of Mr. Gordon's orders and those of DoS.  Mr. Gordon

immediately reported this to Mr. Hoffman and objected to the fact that AGNA had misled DoS

by assuring DoS that Mr. Garcia was to be stripped of his duties and removed from the contract.

Upon information and belief, AGNA allowed Mr. Garcia to resign without repaying monies for

the counterfeit goods and without taking any form of disciplinary action against him.

### Defendants Deliberately Concealed Information from the Committee on Oversight and Government Reform Regarding the Counterfeit Goods and Participation in Commercial Sex Activities by AGNA Personnel.

101.     By letter dated December 13, 2007, Congressman Henry A. Waxman, then

Chairman of the Committee on Oversight and Government Reform, sent a letter to AGI

requesting information about ArmorGroup's security services in Iraq and Afghanistan from

January 1, 2003, to the present, as part of the Oversight Committee's ongoing investigation into the role of private military contractors in Iraq and Afghanistan. Congressman Waxman requested *inter alia*: "all incident reports, investigative reports, correspondence and other documents relating to . . . (b) all incidents involving improper or unprofessional behavior by company personnel, including all incidents resulting in termination or other disciplinary action against security contractor personnel . . . (c) all incidents that could reflect negatively on the company or its clients, including all incidents that led to complaints or allegations of misconduct by company personnel." AGI was to provide "a written certification by an authorized company official that ArmorGroup has provided all [responsive] information and documents." Furthermore, ArmorGroup, and by extension its successor in interest WSI, were under a continuing duty to produce immediately "any newly discovered document."

102.    On or around January 3, 2008, Mr. Gordon learned that an AGNA trainee who had previously worked under Mr. Du Plessis' supervision for another security contractor in Kabul had bragged to other employees in training that his primary reason for returning to Kabul was to take advantage of the human trafficking activities there. This trainee boasted that his friend in Kabul owned a brothel and six Asian women and that he (the trainee) was considering purchasing a woman for $20,000, thus enabling him to start making a profit on this purchase after a month. Another student who was privy to this conversation reported it to AGNA officials. In addition, a DoS investigator, David Lydek, was on site when the issue was reported and was aware of the allegation. Mr. Gordon promptly obtained a statement from the witness and reported the incident to Heidi McMichael, a DoS official, and to AGNA senior management, including Defendants Schmitt and Hoffman. In discussions with Mr. Schmitt and Defendant Hoffman, Mr. Gordon insisted that AGNA needed to take decisive action to investigate and

repudiate these activities. While they both paid lip service to the seriousness of the allegations, neither took appropriate action to investigate whether such conduct was in fact occurring among the current AGNA guard force.

103. In mid-to-late January 2008, AGNA formulated a response to Congress' document demand that deliberately omitted inclusion of any documents relating to the allegations that AGNA's Program Manager, Armorer, and Medic frequented brothels, the subsequent investigation of and disciplinary action taken against Mr. Du Plessis, the outbreak of STDs among the workforce, or the incident involving the trainee referenced above. AGNA also omitted information on the purchase of counterfeit goods by the AGNA Logistic Manager from his wife's company.

104. Mr. Gordon discussed the submission with Mr. Schmitt, who had assumed responsibility for preparing the report to Congressman Waxman. During this discussion, it became clear to Mr. Gordon that Defendants intended to conceal information from Congress. In response to Mr. Gordon's strong objections, Mr. Schmitt responded that AGNA decided that those items "were best left out of the report," as it would "not look good for the company." Mr. Gordon also raised the issue with Mr. Hoffman, who responded that these incidents would not be helpful to AGNA and should not be disclosed.

### AGNA Corporate's Decision to Remove Program Manager Du Plessis Was Reversed After He Successfully Organized a Threatened Gurkha Walk Out.

105. After much discussion, Mr. Hoffman came to the same conclusion as Mr. Gordon that, given Mr. Du Plessis's unethical and illegal conduct and the recent revelations regarding AGNA's purchase of counterfeit goods, it was necessary to remove him from his position as the Program Manager. On or around February 5, 2008, Mr. Hoffman and Mr. Gordon also informed

Contracting Officer Mr. Rogers that Mr. Du Plessis would be removed as Program Manager. Mr. Rogers agreed that it was a necessary decision and "well overdue."

106. Mr. Hoffman departed for Kabul on or around February 10, 2008, with the express purpose of terminating Mr. Du Plessis from the Program Manager position. Upon information and belief, AGI personnel, including Carolyn Ruart, leaked word of the impending termination to Mr. Du Plessis. In an effort to save his job and in complete disregard for the security of the Embassy and its personnel, Mr. Du Plessis persuaded the Gurkha workforce to threaten to walk off the job and leave the U.S. Embassy unprotected if AGNA removed Mr. Du Plessis from the position. Mr. Du Plessis had been instrumental in hiring them, despite the fact that they failed to meet the language requirements set out in the DoS contract.

107. Upon his arrival in Afghanistan, Mr. Hoffman was confronted with the threat of the Gurkha workforce walking off the job. As Mr. Hoffman subsequently informed Mr. Gordon, he concluded that AGNA was left with no choice but to retain Mr. Du Plessis.

108. On or around February 14, 2008, Contracting Officer Representative McMichael, who had been briefed on Mr. Hoffman's decision to remove Mr. Plessis, contacted Mr. Gordon to remind him that AGNA had to submit paperwork to DoS in connection with the removal. Mr. Gordon informed Ms. McMichael that it appeared that Mr. Hoffman had reversed course and would not be following through on his stated plan to remove Mr. Du Plessis. Mr. Gordon also told her that AGNA was primarily concerned with smoothing things over in Afghanistan, rather than placing priority upon decisive management of the contract and corrective action. Mr. Gordon expressed concern that his own job was in jeopardy, and told Ms. McMichael that he could not work in an environment where he would be asked to make false representations to DoS. During the course of this call, Mr. Gordon reiterated concerns he had raised to her and

42

others at DoS previously about AGNA contractors, including Mr. Du Plessis, frequenting

brothels in Kabul, and about allegations that persons sought affiliation with the contract in order

to procure prostitutes. Ms. McMichael acknowledged that the concerns were serious and

asserted that DoS and the Federal Bureau of Investigations were looking at the issue. To Mr.

Gordon's knowledge, no such investigations were ever actually conducted.

109.    Upon information and belief, Ms. McMichael informed Contracting Officer

Rogers and others within DoS about her conversation with Mr. Gordon, and Embassy officials

came to learn of Mr. Gordon's communications with Ms. McMichael. Upon information and

belief, officials at the U.S. Embassy in Kabul informed Mr. Du Plessis that Mr. Gordon had

reported ongoing serious problems with the Kabul Embassy contract to DoS, and he, in turn,

informed Mr. Hoffman and AGI that Mr. Gordon had gone to DoS with his concerns.

### After Learning of Mr. Gordon's Contacts with DoS, Defendants Conspired to Strip Mr. Gordon of his Duties and to Force him into an Involuntary Resignation.

110.    In response to Mr. Gordon's repeated efforts to stop Defendants from violating

contract requirements and his reports to DoS of Defendants' violations, including Mr. Gordon's

actual and perceived contacts with DoS officials in February 2008, Defendants decided to

remove Mr. Gordon from the contract. Already faced with the threat of litigation for unlawful

termination by Messrs. Sauer and Martino based on their whistleblowing, Defendants agreed that

AGNA needed to proceed more cautiously and to make his working conditions intolerable in a

deliberate effort to force him to quit.

111.    By email to Mr. Hoffman dated February 15, 2008, Mr. Gordon emphasized that

he would not be able to continue his role as the Director of Operations if Mr. Du Plessis were

allowed to remain the Program Manager in Kabul because he could not "represent the company

with DoS any longer under these circumstances." Mr. Gordon concluded that he could no longer

be responsible for a deficient contract under which numerous illegalities had occurred, nor did he want to be in the position of having to make misrepresentations to DoS in order to keep the contract afloat.

112. Before Mr. Hoffman returned to the U.S., Mr. Lemmon told Mr. Gordon that Cornelius Medley would be taking over Mr. Gordon's responsibility for the contract in the United States and would be arriving in the U.S. from Kabul in a few days. Mr. Lemmon informed Mr. Gordon that Mr. Du Plessis had demanded this arrangement, and that Mr. Hoffman had acceded to this demand after Mr. Du Plessis informed him that Mr. Gordon had met with DoS and had made other representations to DoS regarding serious problems with the contract.

113. By email dated February 19, 2008, Mr. Du Plessis wrote to Mr. Hoffman seeking Mr. Gordon's immediate replacement because of statements Mr. Gordon made to DoS. He stated: "With your approval and in light of recent events, I wonder if we shouldn't have Cornelius's transfer to McLean expedited to the earliest possible opportunity . . . we all agree that this is probably the best course of action to mitigate damage at DoS given recent events. We believe that certain comments from the RSO to you have been misrepresented to DoS by [Mr. Gordon] which is cause for concern."

114. Faced with impending termination, on February 22, 2008, Mr. Gordon wrote a detailed email to Mr. Hoffman, copied to Ms. Power and Mr. Schmitt, objecting to the turn of events Mr. Du Plessis had orchestrated to have him removed the contract. Mr. Gordon reiterated the significant issues that Mr. Du Plessis has created while in his role as the Program Manager, including: "failure to account for stores and ammunitions correctly, improper procurement processes, consistent failure to meet deliverable timelines, illegal weapons stored in Camp Sullivan, staff members frequenting places where human trafficking has taken place, outbreaks

of STDs within the work force, failure to follow the contract in recruiting additional TCNs in Kabul and placing the company at risk of losing these workers as a result, causing disruption to the contract ...." Mr. Gordon further emphasized that he had brought these complaints to Mr. Hoffman's attention repeatedly in the past and expressed his frustration that AGI's improper control and influence of the DoS contract had impaired his ability to manage the contract. Mr. Gordon closed his correspondence by saying, "I think that we can still come together as a team and move towards a better future for the company and all those who work here."

115.    Upon his return from Kabul, Mr. Hoffman convened a meeting to inform the AGNA staff that Mr. Medley would be the "point of contact" for dealing with the Kabul contract. Following this meeting, Mr. Gordon confronted Mr. Hoffman about the removal of his responsibilities and Mr. Du Plessis' allegation that Mr. Gordon had personally met with representatives at DoS to report AGNA's ongoing failures under the contract. Mr. Hoffman credited reports from Mr. Du Plessis that Mr. Gordon had complained to DoS and for that reason refused to restore Mr. Gordon's duties and responsibilities for managing AGNA's contract with DoS. The Kabul contract comprised at least 95% of Mr. Gordon's work. As such, with Mr. Medley's assumption of those duties, Mr. Gordon was left with virtually no work and no responsibilities.

116.    In addition to stripping Mr. Gordon of his duties, AGNA set out to make Mr. Gordon's working conditions intolerable. Mr. Medley excluded Mr. Gordon from management meetings, intimidated the rest of the staff by asking them if they supported Mr. Gordon or himself, shunned him, and relegated him to a *persona non grata* in the office. Mr. Gordon complained to Mr. Hoffman about Mr. Medley's actions. Initially, Mr. Hoffman assured him falsely that these issues would be dealt with. However, no corrective action was taken, despite

45

Mr. Hoffman's knowledge that Mr. Medley's actions had created a humiliating and hostile work environment for Mr. Gordon. In fact, Mr. Hoffman relegated Mr. Gordon to his office with minimal contacts with any other senior management and regularly excluded him from his meetings, all in an effort to force Mr. Gordon's resignation. Mr. Medley made clear to Mr. Gordon by his behavior and to other staff members by his direct boasts that his priority was to force Mr. Gordon to quit.

117.    In what proved to be futile effort to maintain his position, Mr. Gordon filed a formal complaint with Mr. Hoffman on February 27, 2008, in which he complained about the retaliatory treatment to which he was being subjected. Ms. Power, the Acting Director of Human Resources, approached Mr. Gordon to address his complaint. He informed her that he could not continue in his position at AGNA when he had no responsibilities and was subjected to such hostility by Mr. Medley. He also informed her that AGNA was not performing its duties under the contract, and given their continuous disregard for his advice and input – and management's obvious alignment with Mr. Du Plessis, who persisted in his noncompliance with the contract – he believed that he no longer had a future at AGNA. Ms. Power told Mr. Gordon that she would talk to Mr. Hoffman about his concerns.

118.    Subsequently, Mr. Hoffman met with Mr. Gordon to discuss his complaint. Mr. Gordon reiterated that he could not work under the hostile conditions and for a company that continued to engage in unlawful practices. He further indicated that, given the removal of his duties and responsibilities and his exclusion from meetings, he felt that he had no choice but to resign. Mr. Hoffman did not dispute Mr. Gordon's conclusion that AGNA had indicated by its actions a desire to get rid of him, nor did he try to address Mr. Gordon's concerns in the interest of encouraging him to remain with the company. Rather, Mr. Hoffman instructed Mr. Gordon to

submit a formal and favorable letter of resignation to allow AGNA to save face with DoS, in exchange for which he would provide Mr. Gordon with a letter of reference.

119.    Mr. Gordon was well aware of actions AGNA took to disparage and blackball Messrs. Sauer, Martino and Gorman following their terminations. Accordingly, he acceded to this demand and submitted the requested letter because he feared that he too would be blackballed in the industry if he did not do so. Additionally, Mr. Gordon had recently married a U.S. citizen and was concerned that if he did not accede to Mr. Hoffman's demand, AGNA might try to impede his application for his U.S. legal permanent residence. Left with no options, Mr. Gordon was forced into an involuntary resignation on February 29, 2008.

120.    During the week immediately preceding Mr. Gordon's involuntary resignation, Mr. Gordon met with DoS Contracting Officer Rogers, who recently had been transferred from the Kabul Embassy Contract. Mr. Gordon told Rogers of his impending termination. Mr. Gordon also showed Mr. Rogers his February 22, 2008, email to AGNA management described in paragraph 114 above, in which Mr. Gordon detailed the many legal and contractual violations committed by AGNA under Mr. Du Plessis' watch. Mr. Rogers made a photocopy of the document.

### With Mr. Gordon's Removal, Defendants Were Able Resume Their Misconduct and Conceal Their Unlawful Activities Without Opposition.

121.    On or around February 25, 2008, an AGNA recruiter, Towanda Lyon, was contacted by a reporter from Afghanistan who asked her questions about whether AGNA's Program Manager and guard force personnel had frequented brothels and whether AGNA's Logistic Manager had ordered counterfeit goods from his wife's company. Mr. Lyon, a retired police officer, immediately reported the call to Mr. Schmitt, who appeared unconcerned. Ms. Lyon pressed him about whether in fact such activities were taking place under the contract. Mr.

Schmitt dismissed her concerns and stated that AGNA employees "were all adults" by way of explanation that their patronage of brothels was understandable.

122.    On February 27, 2008, Mr. Schmitt provided false testimony to Congress about AGNA's business practices during his appearance before the United States Senate Committee on Homeland Security and Governmental Affairs.  Mr. Schmitt, contrasting AGNA with the troubled defense contractor Blackwater stated, "In the case of ArmorGroup, we have long-established formal corporate programs to ensure that company employees act at all times within the relevant international and local legal and humanitarian frameworks, including an employee Code of Conduct, a stringent ethics policy, and an ethics review board."  Mr. Schmitt failed to disclose the illegalities of U.S. and international law that plagued the Kabul contract and made no mention of AGNA personnel's patronage of brothels with trafficked women.

123.    Mr. Schmitt further falsely testified, "We ensure our employees are trained and certified on the tenets of international humanitarian law as well as the local laws of the countries in which they operate."  He further gave examples of corporate ethics programs, such as providing "protective services only using defensive measures (effective security management, armored vehicles, body armor and low caliber firearms)" and "[f]ull adherence to and mandatory induction and continuation training on U.S. and host nation local laws and international human rights and humanitarian law," fully knowing that AGNA had been woefully deficient in providing armored vehicles, legally procured weapons, and other items necessary for effective security management and with the knowledge that AGNA employees had violated local, U.S., and international laws with impunity.

124.    In replacing Mr. Gordon with Mr. Medley, a lesser qualified employee, Defendants achieved what they had sought — retention of a Program Manager in country who

would carry out directions provided to him by AGI, and installation of a Director of Kabul

Operations at AGNA Headquarters that would go along with Defendants' efforts to mislead DoS

about its contract compliance problems. After Mr. Gordon was constructively discharged from

AGNA, Company officials routinely withheld information from the DoS Contracting Officer,

falsely blamed Mr. Gordon for any problems that occurred on the contract, and made serious

misrepresentations to DoS about its compliance with the Kabul Embassy contract.

125.    In or around early March 2008, for example, Defendants Hoffman and Medley

instructed Ms. Power to lie to DoS regarding Mr. Garcia's continued employment with AGNA.

They instructed her to tell DoS that AGNA had terminated Mr. Garcia from the contract when, in

fact, he was still working under the Kabul contract and assisting AGNA in conducting

inventories of its ammunition for its reports to DoS.

126.    In fact, after Defendant Medley assumed responsibility for the Kabul Embassy

contract, the ammunition inventory count revealed a shortfall of tens of thousands of rounds of

ammunition. Mr. Medley directed AGNA employee Misty Maldonado, who was responsible for

preparing the inventory report for DoS, to alter the report to remove any reference to the missing

ammunition or the disappearance of the inventory. Only when Deputy Director of Operations

Gregory Vrentas challenged Mr. Medley's direction to provide false reports to DoS did Mr.

Medley back down.

127.    Upon information and belief, Defendant Medley knew that AGNA guards

continued to frequent brothels and took no action to stop this unlawful practice. In a

conversation with AGNA Training Manager Hal Simpson in mid-2008 about the fact that former

Program Manager Nick Du Plessis and fellow guard members had frequented brothels, Medley

remarked that at least AGNA knew what the men were up to when they visited prostitutes and if management took away that outlet, the guards would turn to something else.

128.    Upon information and belief, after Mr. Gordon's departure, AGNA again violated its ITAR license. AGNA had a valid ITAR license which listed David Smallwood as the ITAR-approved trainer. Mr. Du Plessis dismissed Mr. Smallwood; however, AGNA did not obtain a modified ITAR license, as required by law. Consequently, it conducted training in Afghanistan without a valid ITAR license.

129.    On March 10, 2008, based on information provided to DoS by Mr. Gordon while still employed at AGNA, Ms. McMichael, DoS's Contracting Officer's Representative, sent DoS Contracting Officer Mr. Rogers a memoranda entitled "Ongoing Concerns Regarding ArmorGroup North America's Performance" detailing AGNA's failure to resolve issues identified in the July 19, 2007, Cure Notice issued to AGNA. Among the issues raised by Ms. McMichael were serious and ongoing problems staffing the Kabul Embassy contract, including a 90% turnover rate, AGNA's failure to fill key personnel positions, and AGNA's failure to maintain an accurate personnel roster. Based on the information Mr. Gordon had provided to her, Ms. McMichael also raised concerns about: AGNA's failure to supply training weapons, as required under the contract; AGNA's failure to supply armored troop transport vehicles for movement of guards to and from the Embassy compound; AGNA's failure to remove the logistics manager who had purchased counterfeit goods; and AGNA's failure to supply TCN guards with the requisite English language proficiency. Finally, she raised concerns about AGNA's failure to comply with its contractual obligation to adhere to all applicable licensing and registration requirements, both within the U.S. and Afghanistan. The deficiencies detailed in Ms. McMichael's letter were serious ones and were the very issues Mr. Gordon reported to DoS.

130.   AGNA was cognizant of its serious breaches of its contractual obligations to DoS. In March 2008, AGNA conducted an audit of the company's compliance with 45 specific requirements from the DoS contract and its own procedures.   It concluded that of the areas audited, 40% were found to be non-compliant to various degrees.   Of those areas that were determined to be non-compliant, AGNA's audit deemed one-third to be in mission-critical areas, including, most problematically, in the area of hiring and retention of a stable personnel force. Upon information and belief, AGNA failed to provide a copy of its voluminous audit and report to DoS or to disclose the serious problems identified by AGNA's auditors.

131.   On April 30, 2008, DoS Senior Contracting Officer Sharon James sent AGNA President Jerry Hoffman a letter summarizing AGNA's ongoing deficiencies since the start of the contract and four serious additional deficiencies that arose after the July 17, 2007, cure notice.  DoS informed AGNA that it was considering whether to exercise the contract's first option year given AGNA's continued weaknesses and deficiencies.  Despite AGNA's ongoing problems, in July 2008, DoS decided to exercise the contract's first year option because of representations and promises made by incoming G4S/Wackenhut managers, leading DoS to conclude that it was "reasonable" to expect that all performance problems would be corrected by October 1, 2008.

**Even After His Termination, Mr. Gordon Continued to Take the Security Interests of the U.S. Embassy Seriously and Took Actions to Attempt to Secure Wackenhut's Compliance with its AGNA's Contractual Obligations.**

132.   After Mr. Gordon's departure from AGNA, he continued to hear reports about violations of the Kabul contract even after G4S acquired AGI and AGNA that heightened his concerns about the security of the U.S. Embassy and its personnel.  As such, Mr. Gordon felt that Wackenhut Services, Inc., the U.S. subsidiary of G4S that took over the contract, should be

51

apprised of the problems that plagued the contract so as to remedy the situation and provide

adequate security to the U.S. Embassy.  By email dated June 19, 2008, Mr. Gordon wrote to Sam

Brinkley, the Vice President of Defendant WSI, regarding its acquisition of AGNA and his

ongoing concerns about AGNA's failure to comply with its contract with DoS.  He reported, "I

was forced to resign from AGNA when I was marginalized by my superiors after refusing to go

along with the way that the USE Kabul Guard Force contract was being mismanaged and my

steadfast refusal to allow illegal and immoral activities to go on in my area of responsibility."

He asked to meet with Mr. Brinkley to detail the issues he had encountered during his time as the

Director of Operations.  Mr. Brinkley failed to respond to this email, and Mr. Gordon persisted

through contacts with Mark Carruthers, AGNA's Human Resources official, to secure a meeting

with Mr. Brinkley.

133.   On July 15, 2008, Mr. Gordon met with Mr. Brinkley and detailed the illegalities,

material contract violations, and deliberate misrepresentations to DoS that he witnessed during

his time as the Director of Operations of AGNA.  Specifically, Mr. Gordon told Mr. Brinkley

about the brothels and the counterfeit equipment, both of which Mr. Du Plessis had been

involved in and sanctioned. He further informed Mr. Brinkley of allegations he had heard that a

member of AGNA's management at Camp Sullivan had boasted openly about owning prostitutes

in Kabul. He also informed Mr. Brinkley that Mr. Schmitt and Defendant Hoffman had

deliberately withheld information about these issues from Congressman Waxman.  Mr. Brinkley

said he had never heard of these issues and assured Mr. Gordon that WSI would bring the

contract into compliance and clean up all of the illegalities.  Mr. Gordon told Mr. Brinkley that

Mr. Du Plessis was not qualified to be the Program Manager given that he lacked U.S.

citizenship and a top security clearance and had participated in activities involving human

trafficking.  Mr. Brinkley acknowledged that Mr. Du Plessis was not qualified to hold the position and stated that he intended to remove Mr. Du Plessis.  At the conclusion of their meeting, Mr. Gordon told Mr. Brinkley that he was going to "keep an eye" on how WSI managed the DoS contract and would only refrain from taking action against the Company if WSI took the corrective action that Mr. Brinkley assured him it would take.

134.    Despite Mr. Brinkley's assurances, WSI retained Mr. Du Plessis as the Program Manager and continued to run the contract in a seriously deficient manner.  By letter to Mark Carruthers, Vice President of AGNA, dated August 22, 2008, DoS told AGNA that it questioned its ability to provide for the security of the U.S. Embassy in the hostile environment of Afghanistan.  Joseph W. DeChirico, a DoS Contracting Officer, stated that "in view of the ongoing relief guard deficiency, the Government has serious concerns regarding AGNA's ability to respond in the aftermath of a mass casualty incident or an extreme loss of personnel due to mass resignation, hostile fire, or loss of manpower due to illness."  He further charged that "AGNA has not effectively planned for such contingencies and does not have adequate staffing levels and resources should the aforementioned incidents occur."

135.    By September 2008, AGNA's performance problems under the contract had grown so severe that DoS issued a "show cause" letter.  By letter dated September 21, 2008, to AGNA Vice President Mark Carruthers, DoS Contracting Officer Sharon D. James placed AGNA on notice that "the Government is considering terminating" its contact under the default provision of the contract.  She charged that AGNA's "inability to permanently correct personnel staffing shortages has negatively impacted the security posture of the Local Guard Program for the U.S. Mission to Kabul" and has "also affected mission planning and capabilities for contingencies which may place both personnel and property at an unacceptable level of risk…"

She further stated that "[t]he staffing situation has further deteriorated to such a level that …

gravely endangers performance of guard services in a high-threat environment such as

Afghanistan." Mr. Brinkley was copied on the letter.

136.   Despite repeated promises by WSI that the problems identified by DoS had been

corrected, on November 13, 2008, DoS put WSI on notice that it had serious concerns about

AGNA's policy of working guards for longer than the 12-hour limit required by the contract.

Reluctantly, DoS acceded to WSI's request to permit AGNA guards to work in excess of this

limit because AGNA could not provide enough guards without using overtime.

137.   Despite the seriousness of the issues Mr. Gordon raised with Mr. Brinkley in

2008, and the severity of the alarm sounded by DoS, WSI failed to take the requisite corrective

action, and indeed continued to employ Mr. Du Plessis as Program Manager through October

2008, when he resigned of his own accord.

138.   Despite a stellar career, significant experience, and solid references, Mr. Gordon

encountered significant difficulties in locating another comparable position — a circumstance he

encountered for the first time during his career as a defense contractor.  Concerned that AGNA

and its agents had actively blocked Mr. Gordon's employment opportunities and have sullied his

name in the industry, Mr. Gordon, through counsel, put Defendants on notice of his intention to

bring suit against them for unlawful termination.  In response, Defendants, including WSI's

agent Mr. Brinkley, insisted – falsely – that all problems DoS and Mr. Gordon had identified

with WSI's management of the Kabul contract were now fixed and that WSI was running a tight

ship.  These statements were false and Defendants knew them to be false.  Throughout the fall of

2008 and winter of 2009, DoS repeatedly informed AGNA that it had "grave concerns" relating

to AGNA's continuing failure to provide sufficient guards.  WSI sought and received numerous

extensions to come into compliance with the contract's requirements relating to the numbers and qualifications of the guard force. By letter to DoS dated January 24, 2009, AGNA represented to DoS that it had come into full compliance with its staffing requirements. This statement was proven to be false soon after it was made.

139.    By letter dated March 30, 2009, DoS informed AGNA that it had "grave concerns" relating to AGNA's continuing failure to provide sufficient relief guards. It stated that it had conducted spot inspections of WSI's guard force operations earlier in March 2009 and had observed that at least 18 guards were absent from their posts at the embassy, a situation WSI attempted to explain as due to "supervisory personnel negligence" rather than manpower shortages under the contract.

140.    By letter dated April 1, 2009, DoS denied AGNA's request for a waiver to meet contractual language proficiency obligations, the third request of its kind. DoS stated: "[W]e are quite dismayed to learn that after nearly two years of contract performance, AGNA still has language deficiencies among [its] guard force.... AGNA took a huge risk in placing these individuals in positions for which they did not meet the full qualifications." Many key aspects of the contract that Mr. Gordon identified and brought to the attention of DoS remain deficient despite his conscientious efforts, both while employed at AGNA and following his termination through his contacts with WSI, to ensure that corrective action be taken.

141.    Because of his ongoing concerns that AGNA and its new owner Wackenhut had failed to take appropriate action under the contract, that DoS remained lax and ineffective in its oversight of the U.S. Embassy Kabul contract, and that conditions existed which endangered the safety of the U.S. Embassy, Mr. Gordon took his concerns to Senator Claire McCaskill, Chairman of the Subcommittee on Contracting Oversight. The Subcommittee held oversight

hearings on June 10, 2009. Mr. Brinkley provided false testimony to the Committee about AGNA's full compliance with contractual requirements, insisting that the contract was fully staffed.

**COUNT I:     Violation of False Claims Act, Employee Protection Provision, 31 U.S.C. § 3730(h), Against Defendants AGI, AGNA and WSI**

142.    Plaintiff repeats and incorporates herein by reference paragraphs 1 through 141 above.

143.    Mr. Gordon was employed by Defendant AGNA on the Kabul Embassy contract from June 2007 through February 2008 as the Director of Operations. He was responsible for overseeing compliance with the DoS contract and correction of any AGNA deficiencies under the contract. Mr. Gordon was also assigned to oversee AGNA's performance on the NSA Bahrain contract, although Defendants refused to provide him with any meaningful control or responsibility. During the course of his employment, Mr. Gordon investigated numerous instances where Defendants fraudulently induced DoS to release funds under the Kabul Embassy contract, misrepresented AGNA's compliance under the contract, engaged in illegal activities in violation of the contract, made assurances regarding personnel actions that AGNA never fulfilled, and made numerous other misrepresentations to DoS. Mr. Gordon made numerous reports to AGNA, AGI, and DoS officials regarding Defendants' fraud against the United States and the submission of false claims to the United States and sought to stop Defendants' violations of the False Claims Act. Mr. Gordon also investigated, reported and sought to stop Defendants' fraudulent conduct and false claims to DoD on the NSA Bahrain contract.

144.    Defendants were aware that Plaintiff had investigated its unlawful conduct and disclosed to DoS fraudulent representations made by the Defendants to DoS regarding their compliance with the Kabul Embassy contract in addition to illegalities committed under the

contract, and further believed that Plaintiff had clandestinely arranged to meet with DoS to expose all of AGNA's misrepresentations and illegalities. Defendants were also aware of Plaintiff's efforts to stop violations of the False Claims Act.

145. Based on Mr. Gordon's actual and perceived disclosures to DoS, in addition to his internal investigations, complaints and efforts to stop violations of the False Claims Act, Defendants stripped Mr. Gordon of his duties, replaced him with Cornelius Medley, excluded him from meetings, and created a hostile environment in which his subordinates and colleagues were pitted against him. Defendants' actions made the working conditions such that a reasonable employee would have no choice but to resign, and they forced Mr. Gordon into an involuntary resignation.

146. Defendants' action in constructively discharging Mr. Gordon violated 31 U.S.C. § 3730(h), which prohibits retaliation by employers against employees who investigate and/or report false claims and statements within the meaning of 31 U.S.C. § 3729 et seq. 31 U.S.C. § 3729 holds liable any person who, *inter alia*, "knowingly presents … a false or fraudulent claim for payment" and/or "knowingly makes, uses, or causes to be made or used, a false . . . statement to get a false or fraudulent claim paid or approved by the Government." 31 U.S.C. § 3729(a)(1)&(2). Mr. Gordon's actions in investigating and reporting Defendants' fraud in obtaining payment from DoS and DoD could reasonably have led to a viable False Claims Act suit pursuant to 31 U.S.C. § 3729, and they were lawful actions taken in furtherance of other efforts to stop violations of the False Claims Act.

147. Defendants knew of Mr. Gordon's protected activity, as he reported his complaints directly to them and initiated internal investigations. They were also aware of the reports he made to DoS, and they accused him of meeting with DoS to report ongoing concerns.

148.    As a direct and proximate result of the foregoing, Mr. Gordon has lost the benefits
and privileges of employment, and has suffered additional economic and non-economic
damages, including severe emotional anguish and irreparable, continuing to harm his career.  Mr.
Gordon is entitled to all relief necessary to make him whole.

**COUNT II    Tortious Interference With Contractual Relations against Defendants
Hoffman and Medley**

149.    Plaintiff repeats and incorporates herein by reference paragraphs 1 through 148
above.

150.     Mr. Gordon had a valid contractual relationship with Defendant AGNA as an at-
will employee.

151.    Defendants Hoffman and Medley knew of Mr. Gordon's contractual relationship
with AGNA.

152.    Defendants Hoffman and Medley each intentionally interfered with Mr. Gordon's
contractual relationship with AGNA with the objective of bringing about his termination from
employment because of Mr. Gordon's insistence on complying with the Kabul Embassy and
NSA Bahrain contracts, his refusal to provide false information to the U.S., and his insistence on
reporting and rectifying illegal behavior in violation of the contracts and both U.S. and
international law.  The actions of Defendants Hoffman and Medley, which were intended to
bring about Mr. Gordon's termination, violated 18 U.S.C. § 1513(e), which prohibits any person
from knowingly retaliating against a whistleblower who has provided to a federal law
enforcement officer any truthful information relating to the commission or possible commission
of any federal offense.

153.    In acting to bring about termination of Mr. Gordon's employment with AGNA,
Defendants Hoffman and Medley acted out of malice and as a direct result of Mr. Gordon's

objections to, reports about, and refusals to engage in unlawful activities. In his actions aimed to bring about the termination of Mr. Gordon's employment, Defendant Hoffman acted for his own benefit, to the detriment of the Company, and outside of the scope of his authority, to avoid possible liability for fraud in light of his representations to DoS about the removal of Messrs. Garcia and Du Plessis from the contract and other compliance matters. In his actions aimed to bring about the termination of Mr. Gordon's employment, Defendant Medley acted for his own benefit, to the detriment of the Company, and outside of the scope of his authority, to assume Mr. Gordon's responsibilities, position, and ultimate authority over management of the Kabul Embassy and NSA Bahrain contracts.

154.    In tortiously interfering with Plaintiff's contract with AGNA, Defendants acted with malice or with reckless disregard for Plaintiff's rights.

155.    As a direct and proximate result of the foregoing, Mr. Gordon has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to his career. Mr. Gordon is entitled to all relief necessary to make him whole.

**Count III      Wrongful Discharge in Violation of Public Policy Against Defendants AGNA, AGI, Hoffman and Medley**

156.    Plaintiff repeats and incorporates herein by reference paragraphs 1 through 155 above.

157.    In constructively terminating Mr. Gordon from employment with AGNA, Defendants violated the public policy of Va. Code § 18.2-178, which makes it a felony for any person to "obtain, by any false pretense or token, from any person, with intent to defraud, money . . . or other property that may be the subject of larceny . . ."

158.    Defendants were aware that Mr. Gordon refused to provide false information to the United States concerning its compliance with AGNA's contract with DoS, and that his refusal to do so would lead the United States to withhold payments to AGNA under the contract.

159.    Defendants terminated Mr. Gordon in part because he refused to provide false information to the United States.

160.    Defendants' termination of Mr. Gordon violates the public policy mandate of Va. Code § 18.2-178 in that the discharge interfered with Mr. Gordon's legal duty under Virginia Code §§ 18.2- 178 not to engage in the criminal offense of obtaining money by false pretenses.

161.    In wrongfully discharging Plaintiff in violation of public policy, Defendants acted with malice or with reckless disregard for Plaintiff's rights.

162.    As a direct and proximate result of the foregoing, Mr. Gordon has lost the benefits and privileges of employment, and has suffered additional economic and non-economic damages, including severe emotional anguish and irreparable, continuing harm to his career.  Mr. Gordon is entitled to all relief necessary to make him whole.

### COUNT IV   Common-Law Conspiracy Against All Defendants

163.    Plaintiff repeats and incorporates herein by reference paragraphs 1 through 162 above.

164.    Defendants agreed and conspired with one another to tortiously interfere with Mr. Gordon's contractual relationship with AGNA by causing his constructive termination and in doing so acted in violation of the public policy mandate of Va. Code § 18.2-178 because of Mr. Gordon's insistence on complying with the Kabul Embassy and NSA Bahrain contracts, his refusal to provide false information to the U.S., and his insistence on reporting and rectifying illegal behavior in violation of the contracts and both U.S. and international law.

165.    Defendants AGNA and AGI conspired with one another and with others to terminate Mr. Gordon's employment in order to silence him, halt his reporting of contract deficiencies to DoS, impede his ability to investigate potential claims under the False Claims Act, and to put an end to his ability to rectify the numerous illegalities in which AGNA was engaging. Defendants did so for the purpose of fraudulently maintaining the Kabul Embassy and NSA Bahrain contracts, despite numerous violations, and for the purpose of skirting their requirements under the contracts in order to increase profitability and better position the company for sale to G4S.

166.    Defendants Hoffman, Schmitt, and Medley conspired to terminate Mr. Gordon's employment out of malice and as a direct result of Mr. Gordon's objections to, reports about, and refusals to engage, in unlawful activities. Defendant Hoffman conspired with Defendants to terminate Mr. Gordon's employment for his own benefit, to the detriment of the Company, and outside of the scope of his authority, to avoid possible liability for fraud in light of his representations to DoS about the removal of Messrs. Garcia and Du Plessis from the contract and other compliance matters. Defendant Medley conspired with Defendants to terminate Mr. Gordon's employment for his own benefit, to the detriment of the Company, and outside of the scope of his authority, to assume Mr. Gordon's responsibilities, position, and ultimate authority over management of the Kabul Embassy and NSA Bahrain contracts.

167.    All Defendants, including WSI, conspired with one another, both before and after Plaintiff's termination, to withhold information from Congress and to make false statements to Congress, DoS and to the public about AGNA's alleged compliance with the DoS contract.

168.    In subjecting Plaintiff to a common-law conspiracy, Defendants acted with malice or with reckless disregard for Plaintiff's rights.

169.     Through the conspiracies described above and through overt acts they committed in furtherance of those conspiracies, Defendants directly and proximately caused Plaintiff to suffer loss of income and other economic benefits, job search costs and the loss of future employment opportunities, diminished professional status, diminished job opportunities, mental anguish, and emotional distress.

### Prayer for Relief

1.     Enter a judgment in Plaintiff's favor and against Defendants AGNA, AGI, and WSI, under the Employee Protection Provision of the False Claims Act, 31 U.S.C. § 3730(h), in an amount equal to double his amount of backpay, plus frontpay, interest, costs, and attorneys' fees, and special damages for emotional distress in an amount to be determined at trial;

2.     Enter a judgment in Plaintiff's favor and against Defendants Hoffman and Medley for tortious interference with contract;

3.     Enter a judgment in Plaintiff's favor and against all Defendants for conspiracy to commit unlawful acts of wrongful discharge, in perpetration of a common scheme;

4.     Enter a judgment in Plaintiff's favor and against all Defendants for wrongful discharge in violation of public policy;

5.     An award to Plaintiff of compensatory damages in an amount to be proven at trial;

6.     An award to Plaintiff of punitive damages in an amount to be proven at trial

7.     An award of all reasonable attorneys' fees and costs; and

8.     All other relief the Court deems just and proper.

Respectfully submitted,

Janet Goldstein Bar No. 444861
Vogel, Slade & Goldstein, LLP
5225 Wisconsin Ave., N.W., Suite 502
Washington, D.C. 20015
 (202) 537-5900

Debra S. Katz Bar No. 411861
Katz, Marshall & Banks LLP
1718 Connecticut Ave. NW
Washington, D.C. 20009
 (202) 299-1140

Robert Vogel Bar No. 414500
Vogel, Slade & Goldstein, LLP
5225 Wisconsin Ave., N.W., Suite 502
Washington, D.C. 20015
 (202) 537-5900

Lisa J. Banks Bar No. 470948
Katz, Marshall & Banks LLP
1718 Connecticut Ave. NW
Washington, D.C. 20009
 (202) 299-1140

Attorneys for Plaintiff James Gordon

DATED: September 9, 2009

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

_____

JAMES GORDON                                    )
8004 Langbrook Road                             )
Springfield, Virginia 22152,                    )
                                                )
                Plaintiff,                      )
                                                )
        v.                                      )
                                                )
ARMORGROUP NORTH AMERICA, INC.                  )
1420 Spring Hill Road                           )
McLean, Virginia 22102,                         )
                                                )
        Serve:                                  )
                                                )
CORPORATION SERVICE COMPANY                     )
11 S 12th Street                                )
Richmond, Virginia 23218,                       )
                                                )       Civil Action No. _____
and                                             )
                                                )
ARMORGROUP INT'L, PLC                           )
Egginton House                                  )
25 – 28 Buckingham Gate                         )
London, United Kingdom                          )
SW1E 6LD,                                        )
                                                )
        Serve:                                  )
                                                )
CORPORATION SERVICE COMPANY                     )
2711 Centerville Road                           )
Suite 400                                       )
Wilmington, Delaware 19808                      )
                                                )
WACKENHUT SERVICES, INC.                        )
7121 Fairway Drive, Suite 301                   )
Palm Beach Gardens, Florida 33418               )
                                                )

Serve:                                )
                                      )
                                      )
                                      )
                                      )
PRENTICE-HALL CORPORATION             )
SYSTEM, INC.                          )
1090 VERMONT AVENUE, N.W.             )
Washington, DC 20005                  )
                                      )
and                                   )
                                      )
JERRY HOFFMAN                         )
8601 Trabue Road                      )
Richmond, Virginia 23235              )
                                      )
and                                   )
                                      )
CORNELIUS MEDLEY                      )
1420 Spring Hill Road                 )
McLean, Virginia 22102,               )
                                      )
            Defendants.               )
_____ )

## JURY DEMAND

Plaintiff demands a jury trial on all claims so triable.


Debra S. Katz Bar No. 411861
Lisa J. Banks Bar No. 470948
Katz, Marshall & Banks, LLP
1718 Connecticut Ave., N.W., Sixth Floor
Washington, DC  20009
(202) 299-1140 (telephone)
(202) 299-1148 (facsimile)

_Janet Goldstein_/DK

Janet Goldstein Bar No. 444861
Robert Vogel Bar No. 414500
Vogel, Slade & Goldstein, LLP
5225 Wisconsin Ave., N.W., Suite 502
Washington, D.C. 20015
(202) 537-5900
*Attorneys for Plaintiff*

Dated:  September 9, 2009