IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| JAMES GORDON, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) 1:10cv002 (JCC) |
| ARMORGROUP, N.A., *et al.*, | ) |
| | ) |
| | ) |
| Defendants. | ) |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Motions to Dismiss,
or, in the alternative, for Summary Judgment filed by defendant
Jerry Hoffman ("Hoffman") and by defendants ArmorGroup North
America, Inc. ("AGNA"), ArmorGroup, International, PLC
("AGIPLC"), Wackenhut Service, Inc. ("WSI"), and AGNA manager
Cornelius Medley ("Medley") (collectively "the Defendants").
Plaintiff filed a brief in Opposition containing voluminous
exhibits that formed no part of his Complaint.  At oral argument
both parties agreed that the Court could consider matters
outside of the pleading and convert the Motions to Dismiss to
ones for Summary Judgment.   For the following reasons the Court
grants in part and denies in part Defendants' Motions for
Summary Judgment.

# I. Background

Plaintiff's Complaint contains four counts, all predicated on his contention that the Defendants, in varying combinations and to varying degrees, forced him to quit his employment with AGNA. In Count One, he contends that the corporate Defendants (AGNA, AGIPLC, WSI) violated the False Claims Act (the "Act") by constructively discharging him for engaging in activities that the Act protects. (Compl. ¶¶ 143–148.) In Count Two, he contends that the individual Defendants (Medley and Hoffman) tortiously interfered with his employment relationship with AGNA by bringing about his constructive discharge. (Compl. ¶¶ 150–155.) In Count Three, he contends that AGNA, AGIPLC, and the individual Defendants violated Virginia's public policy by constructively discharging him. (Compl. ¶¶ 157–162.) And, in Count Four, Plaintiff contends that the individual and corporate Defendants violated Virginia law by conspiring to bring about his constructive discharge. (Compl. ¶¶ 164-169.) All of these claims are predicated on Plaintiff's contention that the Defendants forced him, or conspired to force him, to quit his employment. The relevant facts are as follows.

In August 2007, Plaintiff became AGNA's Director of

Operations. (Compl. ¶¶ 2, 42-43; Defs.' Mem. in Supp. of Mot.

to Dismiss ("Mem.") Statement of Undisputed Facts ("Defs.'

Facts") at 2.) In that capacity, he held various management

responsibilities in the performance of AGNA's contract to

provide security services to the United States Embassy in Kabul,

Afghanistan (the "Kabul Contract"). (Compl. ¶¶ 1-2; Defs.'

Facts at 2.) The parties vigorously dispute what the Plaintiff

was asked to do during the course of this management post.

The Complaint contains numerous allegations about

controversial, inappropriate, and potentially illegal conduct by

the Defendants with regard to their performance on the Kabul

Contract.[1] Plaintiff contends that he objected to the way that

AGNA managed the Kabul Contract and to the alleged conduct of

the contract's Program Manager, Nick du Plessis ("Du Plessis").

(Compl. *passim.*) Most significantly, Plaintiff contends that he

was given inaccurate or false information to report to the State

---

[1] For example, Plaintiff alleges that Defendants dangerously undertrained,
underequipped and understaffed the security forces working on the Kabul
Contract in an effort to increase AGNA's profits. (*See* Compl. ¶¶ 21-52.)
Plaintiff alleges that he worked continuously to try and rectify this
situation (including reporting these difficulties to the Department of State)
after he became AGNA's Director of Operations. (*See* Compl. ¶¶ 43-52) The
Complaint also alleges that AGNA repeatedly violated various State Department
regulations, for example by failing to comply with security, training and
management regulations relating to the use of non-U.S. personnel on the Kabul
Contract. (*See* Compl. ¶¶ 53-62.) Again, Plaintiff attempted to resolve
these issues with the Government but was frustrated by Defendants. (*See*
Compl. ¶¶ 63-66.) Plaintiff also alleges that he discovered and reported to
AGNA that various employees were frequenting prostitutes and thereby
potentially violating human trafficking laws and various State Department and
contractual regulations. (*See Compl. ¶¶ 68-84.*)

Department by Defendants and Du Plessis and that he was required by Defendants to make fraudulent representations to the State Department and Congress. (*See, e.g.*, Compl. ¶¶ 56, 59-61, 64-68, 71, 133.) For example, Plaintiff alleges that Defendants suppressed reports about AGNA's violations of the Trafficking Victims Protection Act and obstructed his efforts to conduct a meaningful investigation into such activity by Du Plessis. (Compl. ¶¶ 68-84.) Defendants also allegedly directed Plaintiff to make misrepresentations to the Department of State ("DoS") to obtain funds that DoS had withheld due to AGNA's non-compliance with the Kabul Contract. (Compl. ¶¶ 85-93.)

It is undisputed that Plaintiff informed Defendants that he could not "represent the company with [DoS] any longer" and "could no longer be responsible" for the Kabul contract. (*See* Compl. ¶ 111; Defs.' Mem. at 3.) Plaintiff further argues that he stated that he could "no longer make representations to DoS about AGNA's contractual compliance and the steps that it would take to achieve compliance, given its clear intent not to follow through" after becoming increasingly concerned that he would "unwittingly be placed again in the position of making misrepresentations to DoS about commitments to cure contractual

deficiencies that Defendants never intended to honor."[2]  (Compl.

¶¶ 92, 93.)

On February 22, 2008, Plaintiff wrote a detailed email

to Defendant Hoffman reiterating the significant issues that Du

Plessis created in his role as the Program Manager, including:

> "failure to account for stores and ammunitions
> correctly, improper procurement processes, consistent
> failure to meet deliverable timelines, illegal weapons
> stored in Camp Sullivan, staff members frequenting
> places where human trafficking has taken place,
> outbreaks of STDs within the work force, failure to
> follow the contract in recruiting additional TCNs in
> Kabul and placing the company at risk of losing these
> workers as a result, causing disruption to the
> contract . . ."

(*See* Compl. ¶ 114.)  Plaintiff stated further: "I think that we

can still come together as a team and move towards a better

future for the company and all those who work here."  (*See*

Compl. ¶ 114.)

On February 16, 2008 Hoffman told Plaintiff that

Hoffman accepted Plaintiff's decision.  (Defs.' Ex. 1 (Gordon

Decl.) ¶ 77.)  Medley took his place.  (*See* Compl. ¶ 112.)

Plaintiff alleges and Defendants offer no facts to

dispute that Defendants then began to try to constructively

discharge him by "making [his] working conditions intolerable."

---

[2] Plaintiff contends that shortly thereafter, however, Plaintiff was again put
in a position in which he unwittingly made false statements to a DoS
Contracting Officer that AGNA's logistics manager in Kabul, who had purchased
counterfeit goods, had been terminated, only to learn that manager had not
been terminated, in violation of DoS orders.  (Compl. ¶¶ 97-99.)  The
Defendants were aware that Plaintiff had investigated and reported to the
Government many of their fraudulent representations made DoS regarding their
compliance with the Kabul Contract.  (Compl. ¶ 144.)

(Compl. ¶ 116.)  Hoffman convened a meeting to inform the AGNA staff that Medley would be the "point of contact" for dealing with the Kabul Contract going forward.  (Compl. ¶ 115.) Plaintiff alleges that "Mr. Hoffman credited reports from Mr. Du Plessis that Mr. Gordon had complained to DoS and for that reason refused to restore Mr. Gordon's duties and responsibilities for managing AGNA's contract with DoS." (Compl. ¶ 115.)  The Kabul Contract comprised at least 95% of Plaintiff's work.  (Compl. ¶ 115.)  As such, with Medley's assumption of those duties, Plaintiff was left with virtually no work and no responsibilities.  (Compl. ¶ 115.)

Plaintiff alleges, and Defendants have not offered any evidence refuting the fact, that Medley excluded Plaintiff from management meetings, shunned him, and relegated him to a position of *persona non grata* in the office.  (Compl. ¶ 116.) When Plaintiff complained to Hoffman about Medley's actions, no corrective action was taken.  (Compl. ¶ 116.)  In fact, Hoffman relegated Plaintiff to his office with minimal contacts with any other senior management and regularly excluded him from meetings, all in an effort, according to Plaintiff's allegations, to force his resignation.  (Compl. ¶ 116.)  Medley made clear to Plaintiff by his behavior, and to other staff members by his direct boasts, that his priority was to force Gordon to quit.  (Compl. ¶ 116.)

It is undisputed that days before his resignation Plaintiff "tried in every way that [he] could to get AGNA to reverse course and restore [his] responsibilities or to find another meaningful role" at AGNA and that he remained in AGNA's employ "in the hope that he could turn the situation around or that Hoffman would find another position for him within AGNA." (Defs.' Ex. 1 (Gordon Decl.) ¶¶ 77, 87.) Plaintiff's Complaint details the steps he took in the administrative process within the AGNA to try to rectify his situation. (*See* Compl. ¶¶ 117-118.) By letter dated the next day, February 28, 2008, less than a month after withdrawing from involvement in the Kabul Contract, Plaintiff resigned his employment. (Compl. ¶ 119.) In that letter Plaintiff speaks very highly of his experience with AGNA. (Defs.' Ex. 2 (O'Connell Decl.) ¶ 8, Ex. C.) Plaintiff contends that he wrote a favorable resignation letter only to protect his reputation within the industry and his chances for future employment. (*See* Compl. ¶¶ 89-92.)

Plaintiff originally filed this Complaint in the District of Washington D.C. on September 9, 2009. [Dkt. 1.] The case was transferred to the Eastern District of Virginia on December 22, 2009. [Dkt. 23.] Hoffman filed a Motion to Dismiss on June 10, 2010 [Dkt. 43], following a Motion to Dismiss by the other Defendants on May 28, 2010. [Dkt. 35.] Plaintiff has opposed and the Motions are now before the Court.

## II. Standard of Review

Where "matters outside the pleading are presented to and not excluded by the court," a 12(b)(6) motion may be converted to a motion for summary judgment. Fed. R. Civ. P. 12(b). In such instances, the court must give all parties "reasonable opportunity to present all material made pertinent to such motion by Rule 56." *Id.; see also Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976). According to the Fourth Circuit, "reasonable opportunity includes some indication by the court to all parties that it is treating the 12(b)(6) motion as a motion for summary judgment, with the consequent right in the opposing party to file counter affidavits or to pursue reasonable discovery." *Plante v. Shivar*, 540 F.2d 1233, 1235 (4th Cir. 1976)(quoting *Johnson v. RAC Corp.*, 491 F.2d 510, 513 (4th Cir. 1974)). Here, reasonable opportunity was given to all parties and all parties agreed at oral argument that the Court could consider matters outside of the pleading.

Summary judgment is appropriate if the record shows "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986); *Evans v. Techs. Applications & Serv., Co.*, 80 F.3d 954, 958-59 (4th Cir. 1996). The party seeking summary judgment has the initial burden to show the

absence of a genuine issue of material fact.  *Celotex Corp. v.*
*Catrett*, 477 U.S. 317, 325 (1986).  A genuine issue of material
fact exists "if the evidence is such that a reasonable jury
could return a verdict for the non-moving party."  *Anderson*, 477
U.S. at 248.  To defeat a properly supported motion for summary
judgment, the non-moving party "must set forth specific facts
showing that there is a genuine issue for trial."  *Id.*
(quotation omitted).  The facts shall be viewed, and all
reasonable inferences drawn, in the light most favorable to the
non-moving party.  *Id.* at 255; *see also Lettieri v. Equant Inc.*,
478 F.3d 640, 642 (4th Cir. 2007).

      The existence of a scintilla of evidence or of
unsubstantiated conclusory allegations, however, is insufficient
to avoid summary judgment.  *Anderson*, 477 U.S. at 248-52.
Summary judgment is proper "if the pleadings, the discovery and
disclosure materials on file, and any affidavits show that there
is no genuine issue as to any material fact and that the movant
is entitled to judgment as a matter of law."  *Triton Marine*
*Fuels Ltd., S.A. v. M/V Pacific Chukotka*, 575 F.3d 409, 412 (4th
Cir. 2009) (*citing* Fed. R. Civ. P. 56(c)); *see Anderson,* 477
U.S. at 248.

### III. Analysis

Defendants' Motions are premised on the argument that Plaintiff has failed to show he was constructively discharged when he resigned from AGNA in February 2008.  This argument is more complex then it first appears as Plaintiff was an "at-will" employee working in the Commonwealth of Virginia.  Virginia law protects the rights of parties in enter into "at-will" employment contracts and strongly enforces the "at-will" employment doctrine.  This Court will first examine Plaintiff's state law claims before turning to his False Claims Act retaliation claims.

#### A.    State Law Claims

Whether or not an employee can generally be constructively discharged in Virginia, under Virginia Law an at-will employee cannot.[3]  *See, e.g.*, *Wright v. Donnelly,* 28 Va. Cir. 185 (1992) (holding that Virginia does not recognize the tort of wrongful constructive discharge).  The employment-at-will doctrine is a "settled part of the law of Virginia."

---

[3] The Virginia Supreme Court has yet to address the issue of whether an employment discharge can be constructively accomplished. *See Barron v. Netversant-Northern Virginia, Inc.,* 68 Va. Cir. 247 (Va. Cir. 2005); *Johnson v. Behsudi* 52 Va. Cir. 533, (Va. Cir. Ct. 1997).  Virginia Circuit Court judges have reached different conclusions on this issue.  (*Compare Jones v. Prof'l Hospitality Res., Inc.,* 35 Va. Cir. 458 (1995) *and Wright,* 28 Va. Cir. 185 (holding that Virginia does not recognize the tort of wrongful constructive discharge), *with Dowdy v. Bower,* 37 Va. Cir. 432 (1995), *and Molina v. Summer Consultants, Inc.,* Law No. 152715 (Fairfax County Cir. Ct. Dec. 9, 1996) (holding that Virginia does recognize the tort of wrongful constructive discharge)).

*Miller v. SEVAMP, Inc.,* 234 Va. 462, 468 (1987).  As the

Virginia Supreme Court has held:

> Parties negotiating contracts for the rendition of
> services are entitled to rely on [the at-will
> doctrine's] continued stability. Serious policy
> considerations, affecting countless business
> relationships, are involved in any change that may be
> contemplated.  We therefore think it wise to leave to
> the deliberative processes of the General Assembly any
> substantial alteration of the doctrine.

*Id.*   The Virginia Supreme Court created a narrow exception to

this general rule when an employee "was fired in violation of an

established public policy."  *Bowman v. State of Keysville*, 229

Va. 534, 540 (1985); *Lockhart v. Commonwealth Educ. Sys. Corp.,*

247 Va. 98 (1994).  "An allegation of constructive discharge

does not bring [Plaintiff's claim] within the 'narrow exception'

to the general rule under *Bowman v. State of Keysville* that an

at-will employee can be discharged at any time after reasonable

notice without cause by the employer."  *See Wright,* 28 Va. Cir.

at 186.

The Fourth Circuit follows this approach.  In *Hairston

v. Multi-Channel TV Cable Co.*, No. 95cv2363, 1996 WL 119916 (4th

Cir. Mar. 19, 1996), an at-will employee/plaintiff brought a

wrongful discharge action against her employer claiming that

racial harassment and discrimination forced her to resign.  The

Fourth Circuit upheld the dismissal, specifically finding that

"no Virginia court has expanded the *Lockhart*[/*Bowman*] exception

to a claim of constructive discharge." *Id*. at *2. Gordon's state law claims are similarly predicated upon the constructive discharge doctrine and these claims, like those in *Hairston* must be dismissed. Therefore, the allegations against all individual defendants are dismissed with prejudice.

### B. Federal Claims

While there is no constructive discharge exception to Virginia's employment-at-will rule, this Court has allowed an at-will employee/plaintiff to predicate a False Claims Act claim on an alleged constructive discharge. *United States, ex rel. DRC, Inc. v. Custer Battles, LLC*, 444 F. Supp. 2d 678, 691 (E.D. Va. 2006), *rev'd on other grounds*, 562 F.3d 295 (4th Cir. 2009). Defendants concede that they know of no contrary decisions but argue that Plaintiff cannot establish that he was constructively discharged under the applicable federal law.

To establish a constructive discharge, the plaintiff must show that his employer "deliberately made [the] working conditions intolerable in an effort to induce [the plaintiff] to quit." *Matvia v. Bald Head Island Mgmt., Inc.*, 259 F.3d 261, 272 (4th Cir. 2001) (citation omitted). "Deliberateness exists only if the actions complained of were intended by the employer as an effort to force the plaintiff to quit." *Taylor v. Va. Union Univ.*, 193 F.3d 219, 237 (4th Cir. 1999). Whether an employment environment is intolerable is determined from the

objective perspective of a reasonable person. *Williams v. Giant Food Inc.,* 370 F.3d 423, 434 (4th Cir. 2004). "An employee may not be unreasonably sensitive to his working environment. Thus, the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Goldsmith v. Mayor and City Council of Balt.*, 987 F.2d 1064, 1072 (4th Cir. 1993). "However, mere dissatisfaction with work assignments, a feeling of being unfairly criticized, or difficult or unpleasant working conditions are not so intolerable as to compel a reasonable person to resign." *James v. Booz-Allen & Hamilton, Inc.,* 368 F.3d 371, 378 (4th Cir. 2004) (internal quotation marks and alterations omitted); *Alba v. Merrill Lynch & Co.,* 198 F. App'x. 288, 294 (4th Cir. 2006) (holding that critical supervisors, threats of loss of retirement benefits for refusal to resign, and disconnecting access to the computer system necessary to complete is daily work were not so intolerable as to establish claim for constructive discharge under the Age Discrimination in Employment Act (ADEA)).

Here, Plaintiff complains that the conditions that he faced while working on the Kabul Contract were "intolerable." Plaintiff argues that it is well-established that pleading facts sufficient to demonstrate that plaintiff was pressured to violate the law as a condition of employment gives rise to a claim of constructive discharge. *Custer Battles,* 444 F. Supp. 2d

at 691 (E.D. Va. 2006) (finding employee was constructively discharged when he chose to resign rather than entangle himself in his employer's fraudulent practices after he discovered and provided warning about employer's fraudulent billing in violation of the False Claims Act). Plaintiff's Complaint contains numerous allegations of wrongdoing and illegal conduct where various Defendants attempted to convince Plaintiff to fraudulently deceive DoS. (*See supra* Section I.)

Defendants attempt to cabin Plaintiffs Complaint, arguing that "the set of working conditions relevant to a constructive discharge claim is the one that the plaintiff faced when he resigned." *See, e.g.*, *Jones v. Greenville Hosp.,* 166 F.3d 1209 (4th Cir. 1998) (work conditions were not intolerable since the alleged harasser left the workplace two months before plaintiff resigned); *King v. AC&R Adver.*, 65 F.3d 764, 767 (9th Cir. 1995) (constructive discharge claim requires working conditions to be intolerable "at the time of [the employee's] resignation"). Here, Plaintiff was reassigned per his request; thus, according to Defendants, the only germane work conditions are those that Plaintiff faced *after* AGNA granted his request to be removed from the Kabul Contract. (Def.'s Mem. in Supp. of Mot. to Dismiss at 9.)

At this stage of the proceedings, there is a genuine issue of material fact regarding the continued nature and

duration of the allegedly illegal acts Plaintiff was requested and required to participate in.  It remains unclear if the reassignment and subsequent isolation of the Plaintiff cured or continued the allegedly intolerable working conditions. Allowing this case to proceed to discovery will allow the parties to attempt to resolve this factual dispute.

## IV.  Conclusion

For the foregoing reasons, the Court will grant in part and deny in part defendants ArmorGroup North America, Inc., ArmorGroup, International, PLC, Wackenhut Service, Inc., and AGNA manager Cornelius Medley's Motion to Dismiss or in the alternative for Summary Judgment, and grant defendant Jerry Hoffman's Motion to Dismiss.

An appropriate Order will issue.


|                      | /s/                                      |
| -------------------- | ---------------------------------------- |
| August 27, 2010      | James C. Cacheris                        |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE       |